Adam Polk (No. 273000)
Trevor Tan (No. 281045)
Fatima Ladha (No. 353675)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
Email: apolk@girardsharp.com
Email: ttan@girardsharp.com
Email: fladha@girardsharp.com

*Interim Co-Lead Class Counsel*

Robert C. Schubert (No. 62684)
Amber L. Schubert (No. 278696)
Daniel L.M. Pulgram (No. 354569)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
Email: rschubert@sjk.law
Email: aschubert@sjk.law
Email: dpulgram@sjk.law

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| *In re Blue Shield of California Data Privacy Litigation*<br><br>This Document Relates To:<br><br>All Actions | Case No. 4:25-cv-03209-YGR<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Class Plaintiffs Rachel Markovitz, Austin Kahn, and Susan Reiman file this consolidated class action complaint individually and on behalf of all similarly situated individuals against Defendant California Physicians' Service d/b/a Blue Shield of California ("Blue Shield") and allege as follows:

## INTRODUCTION

1. Few things are more closely guarded than the details of someone's health, medical conditions, treatments, and choice of doctor. Many federal and state laws require hospitals, doctors, and their business associates to keep patients' information in the strictest confidence. And the penalties for wrongfully disclosing or mismanaging patient data are severe—in some cases, even criminal.

2. This class action involves Blue Shield's role in facilitating the wrongful interception and disclosure of sensitive medical information. Blue Shield installed online tracking services including Google Analytics and the Meta Pixel on its website, giving Google LLC ("Google") and Meta Platforms, Inc. ("Meta") access to Plaintiffs' and Class members' personally identifying information ("PII") and protected health information ("PHI") without their knowledge or consent.

3. By installing Google Analytics and the Meta Pixel on its website, Blue Shield knowingly shared massive amounts of Blue Shield enrollees' (*i.e.* current and former Blue Shield members who had accounts on the Blue Shield website between 2012 and 2025) protected and strictly confidential communications, PII, and PHI with Google and Meta.

4. When enrollees used Blue Shield's website to locate or contact doctors, find clinical locations, or search for information on various treatments, Google Analytics and the Meta Pixel locked onto the visitors, tracked their activities, and intercepted their communications in transit on the site. The communications collected by Google Analytics and the Meta Pixel were automatically transmitted to Google and Meta, respectively, where they were packaged to provide detailed insights on each individual enrollee's activities on Blue Shield's website and for use in personalized advertisements, among other things.

5. Moreover, Blue Shield's use of Google Analytics and the Meta Pixel on its website violated its obligation under the Health Information Portability and Accountability Act ("HIPAA")

to safeguard enrollees' PHI. Under HIPAA and associated regulations, health care providers like Blue Shield are required to protect health information linked to specific individuals from disclosure to unauthorized third parties. *See* 42 U.S.C. §§ 1320d *et seq.*; 45 C.F.R. §§ 160.101 *et seq*.

6. Blue Shield's conduct violated federal law. The Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the unauthorized interception of the contents of any electronic communication. 18 U.S.C. § 2511. It not only prohibits the intentional interception of electronic communications—it also bars anyone who "*procures any other person* to intercept or endeavor to intercept" these communications. 18 U.S.C. § 2511(a) (emphasis added). And it provides a private right of action to anyone whose electronic communications were intercepted, disclosed, or intentionally used in violation of the Act. 18 U.S.C. § 2520.

7. By intentionally installing Google Analytics and the Meta Pixel on its website, Blue Shield enabled Google and Meta to intercept the contents of Plaintiffs' and Class members' highly sensitive, health-related electronic communications for use in targeted advertising without their consent. That wiretapping was designed to capture the details of Plaintiffs' and Class members' past, present, and future physical health and healthcare—even the treatments they were seeking and the names of their healthcare providers—for the purpose of sharing that information with third parties, for Blue Shield's profit. This was a collateral, secret use of information enrollees are required to provide to obtain care. Because this undisclosed data collection is beyond the "use case," a reasonable patient could not expect that Blue Shield would be selling the very information patients are required to disclose in order to receive care. Moreover, Blue Shield did not expressly or clearly disclose these practices, or offer its patients an opt-out choice. Thus, no reasonable person could have consented to such invasive tracking by tech companies, and Plaintiffs and Class Members did not consent here.

8. Blue Shield invaded Plaintiffs' and Class members' privacy by enabling Google and Meta to obtain unwanted access to Plaintiffs' and Class members' health information in violation of the law and social norms. This information was personal, sensitive, and protected by federal (and California) law. Plaintiffs' and Class members' reasonable expectation of privacy was further bolstered by Blue Shield's own policies, which pledged to not disclose or use Plaintiffs' and Class

members' health information without their express consent. Blue Shield's decision to share this information with the world's largest tech companies and online advertisers violated their fundamental privacy rights in violation of federal law.

9. Blue Shield is thus liable to Plaintiffs and those similarly situated under the Wiretap Act for facilitating the interception of their data by Google and Meta without their consent. Accordingly, Plaintiffs bring this action and seek all civil remedies, including compensatory, statutory, and punitive damages, injunctive relief, and attorneys' fees and costs.

## PARTIES

10. Plaintiff RACHEL MARKOVITZ is a resident of Riverside County and a citizen of California, whose information was tapped and recorded by Google and Meta without Plaintiff's knowledge or consent as a direct result of Blue Shield's installation of Google Analytics and the Meta Pixel, respectively.

11. Plaintiff SUSAN REIMAN is a resident of Orange County and a citizen of California, whose information was tapped and recorded by Google and Meta without Plaintiff's knowledge or consent as a direct result of Blue Shield's installation of Google Analytics and the Meta Pixel, respectively.

12. Plaintiff AUSTIN KAHN is a resident of Los Angeles County and a citizen of California, whose information was tapped and recorded by Google without Plaintiff's knowledge or consent as a direct result of Blue Shield's installation of Google Analytics.

13. Defendant CALIFORNIA PHYSICIANS' SERVICE d/b/a BLUE SHIELD OF CALIFORNIA ("Blue Shield") is a corporation headquartered at 601 12th Street, Oakland, California 94607. Blue Shield is an independent member of the Blue Cross Blue Shield Association—a federation of independent and locally operated Blue Shield companies across the United States. Blue Shield and its affiliates provide health, dental, vision, Medicare and Medicaid health care service plans to California consumers. Blue Shield is a major health plan organization with around 6 million members, over 6,500 employees and more than $27 billion in annual revenue.

14. In 2025, Blue Shield restructured its affiliations. Blue Shield is now overseen by a new corporate entity called Ascendiun. Ascendiun oversees Blue Shield; Blue Shield of California Promise Health Plan, a managed care organization wholly owned by Blue Shield and offering Medi-Cal plans; Stellarus, a healthcare business focused on pharmacy care and technology; and Altais, a healthcare company. Ascendiun is Blue Shield's ultimate parent and the primary Blue Cross Blue Shield Association licensee.

15. While the nonparties mentioned above are not being named as defendants in this action at this time, Plaintiffs reserve the right to amend and name them as defendants if warranted.

## **JURISDICTION AND VENUE**

16. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, specifically the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are more than 100 proposed Class Members, some members of the proposed class and the Defendant are citizens of different states, and the amount in controversy exceeds $5 million.

17. This Court has general personal jurisdiction over Blue Shield because it is a California corporation and maintains its principal place of business in this State.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Blue Shield resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

19. Divisional Assignment: Pursuant to Civil L.R. 3-2(c) and 3-5(b), assignment to the Oakland Division of the Northern District of California is proper because a substantial part of the events or omissions which gave rise to the claims occurred in Alameda County—where Blue Shield is headquartered—which is located in this Division.

## FACTUAL ALLEGATIONS

**I. Enrollees on Blue Shield's website reasonably expect their information to stay private.**

20. Like most insurance providers, Blue Shield has a website. Blue Shield allows its enrollees to create an account on that website using their member ID or Social Security number. This allows enrollees to manage many aspects of their healthcare, including to "find a doctor, access paperless claims, or schedule virtual care."[1] Blue Shield enrollees can also use the website to search for specialists and services, explore healthcare plans, and find information about their healthcare conditions. Enrollees routinely input their private, confidential medical information, including information related to specific health conditions and treatments, into the site to access information and services.

21. Enrollees have a reasonable expectation that Blue Shield will keep their health information private. Indeed, in signing up for Blue Shield, they execute a HIPAA disclosure which emphasizes the confidential nature of the medical information they share. In reliance on these promises, enrollees then disclose highly sensitive details about their health conditions, concerns, illnesses, physician selections, doctor-patient communications, and geolocations with Blue Shield through its website for the purpose of obtaining care. Given the sensitive nature of the information enrollees share on the website, and the promises that Blue Shield makes about taking care to protect their information, an objectively reasonable Blue Shield patient would understand that their sensitive medical information would not be shared to undisclosed third parties like Google or Meta for purposes unrelated to medical treatment or care provided by Blue Shield.

22. Enrollees' reasonable expectation of privacy is even stronger because Blue Shield is legally obligated by the United States Department of Health and Human Services' ("HHS") "Privacy Rule" to safeguard PHI under HIPAA. 45 C.F.R. § 160.103; 42 U.S.C. §§ 1302, *et seq.* The Privacy Rule protects information that (1) is "created or received by a health care provider"; (2) relates to "the past, present, or future physical or mental health or condition of an individual" or "the provision of

[1] Blue Shield, *Create New Account*, blueshield.ca.com (archived March 6, 2023), bit.ly/3N8gLY1. This account is password protected and can only be accessed by Blue Shield enrollees.

health care to an individual"; and (3) that either "identifies the individual" or reasonably "can be used to identify the individual." 45 C.F.R. § 160.103. When a Blue Shield enrollee logs into Blue Shield's website and uses search terms to find a particular physician or treatment, HIPAA prohibits Blue Shield from surreptitiously forwarding those inputs to undisclosed third parties like Google and Meta.

## II. Blue Shield allowed Google and Meta to intercept enrollees' data without consent.

23. Blue Shield concedes it must protect Plaintiffs' and Class members' PHI, acknowledging its obligations on its website and promising to follow HIPAA and California law. In its "Notice of Privacy Practices" ("HIPAA Notice"), Blue Shield assures enrollees that "[w]e are required to maintain the privacy of your PHI and to notify you in the event that you are affected by a breach of unsecured PHI."[2]

24. Blue Shield adds that "[w]hen we use or give out ('disclose') your PHI, *we are bound by the terms of this Notice*, which applies to *all* records that we create, obtain, and/or maintain that contain your PHI."[3] While Blue Shield provides a limited list of reasons they may disclose an enrollee's PHI related to treatment, payment and healthcare operations, Blue Shield does not inform enrollees about its disclosure to third parties Google and Meta for targeted marketing. To the contrary, Blue Shield specifically promises that it "will not use your PHI for marketing purposes without your prior written authorization."

25. Likewise, Blue Shield's Online and Mobile Privacy Notice ("Privacy Policy") states that "[a]ny personal information you provide on our website or App will be used only in ways consistent with this [Privacy Policy], the HIPAA [Notice] . . . and in accordance with applicable laws and regulations."[4]

---

[2] Blue Shield, "Notice of Privacy Practices," www.blueshieldca.com (accessed January 30, 2024), https://perma.cc/A8BF-YYAY.

[3] *Id.* (emphasis added).

[4] Blue Shield, "Online and Mobile Privacy Notice," blueshieldca.com (accessed January 31, 2024), https://perma.cc/5N85-5SP6.

26. But Blue Shield didn't honor its promises. Unbeknownst to enrollees, while they were using Blue Shield's website, Blue Shield was allowing Google and Meta to secretly intercept their communications—including PII and PHI—in real time through the use of covert tracking tools.

27. On April 9, 2025, Blue Shield issued a Notice of Data Breach to insurance plan participants, including enrollees, first disclosing that it was allowing enrollees' medical information to be shared with Google through Google Analytics. The disclosure stated, as relevant here:

> Blue Shield of California has begun notifying certain members of a potential data breach that may have included elements of their protected health information.
>
> ***
>
> **What happened**
>
> Like other health plans, Blue Shield historically used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites. We were doing this to improve the services we provide to our members.
>
> On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns back to those individual members. We want to reassure our members that no bad actor was involved, and, to our knowledge, Google has not used the information for any purpose other than these ads or shared the protected information with anyone.
>
> Blue Shield severed the connection between Google Analytics and Google Ads on its websites in January 2024. We have no reason to believe that any member data has been shared from Blue Shield's websites with Google after the connection was severed. Upon discovering the issue, Blue Shield immediately initiated a review of its websites and security protocols to ensure that no other analytics tracking software is impermissibly sharing members' protected health information.
>
> **What information was involved**
>
> The information that may have been impacted includes the following:
>
> Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for members' online accounts; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

28. Blue Shield's Notice of Data Breach contained the following admissions regarding its use of Google Analytics:

a. Blue Shield *voluntarily* shared information with Google for several years. While Blue Shield characterized the incident as a "data breach," it did not identify a hacker or other bad actor who obtained unauthorized access to its website.

b. The information Blue Shield shared "likely included" several categories of sensitive, protected health information, such as: "medical claim service date and service provider, patient name, and patient financial responsibility; and 'Find a Doctor' search criteria and results (location, plan name and type, provider name and type)."

c. Google used this information to conduct focused ad campaigns back to those individual enrollees.

d. Blue Shield decided to "sever[] the connection between Google Analytics and Google Ads on its websites in January 2024." Despite this admission, Blue Shield claims it did not discover its disclosure of PHI to Google until February of 2025. And it did not send notifications to affected persons until April 2025.

29. Blue Shield's actions violated its obligations to keep enrollees' personal health information confidential from unconsented-to third parties and, particularly, to avoid doing so using online tracking technologies. Although Blue Shield has characterized this as a "breach," the data was transmitted using code Blue Shield deliberately installed on its systems. And Blue Shield's notice tacitly admits that Blue Shield had not previously disclosed these transmissions to its customers.

**III. Blue Shield's website transmitted its enrollees' PII and PHI to Google.**

30. Blue Shield's website transmitted its enrollees' PII and PHI to Google.

31. One mechanism Blue Shield used to disclose enrollees' PII and PHI was Google Analytics, which Blue Shield embedded into its website alongside Google Ads. Google Analytics is a powerful tool that, when activated, enables site owners to uniquely identify, track, and transmit site users' activities. Sharing users' personal information with Google Analytics unlocks a host of

powerful insights that website owners, like Blue Shield, use to streamline their sites, sell more services, and increase revenue.

32. Installing Google Analytics alongside Google Ads also enables site owners to purchase targeted, personalized advertising from Google. Google Analytics intercepts a user's communications with Blue Shield's website in transit and continues to do so as the communications occur. By design, Google Analytics received and recorded users' activities on Blue Shield's website by attaching a particular string of code to communications between users and the website. For example, when a user searches for a specific term on the website's Find a Doctor search bar, Google Analytics attaches a string of code to the resulting web address, causing the user's search terms to be sent not only to the website, but also to Google. Importantly, Google Analytics' tracking services are designed to be invisible to website visitors and can be detected only by delving into the website's underlying source code. The website user remains unaware of the presence of Google Analytics and Google Ads and has no way of preventing its activities.

33. Google Analytics collects PII and PHI from Blue Shield's website. As Google's Privacy Policy explained, "[t]he information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number."

34. Google Analytics also assigned unique tracking "cookies" to individual users on Blue Shield's website that allowed their communications and activity on the website to be individually distinguished.

35. Taken together, Google Analytics' tracking features pulled and collected specific data for each individual enrollee to Blue Shield's website in real time while they used the website. That enabled Blue Shield, and, by extension, Google, to "pull event information for any given user" and "analyze and export event level data for a single user."

36. Google recognizes the privacy risks inherent in a service that collects so much information on individual users. To mitigate the risk that sensitive or personal information is shared

with Google through its software, Google urges its customers to take steps to prevent customer data from being collected through its software.

37. For example, Google provides Analytics users an opt-in feature that automatically anonymizes users' IP addresses. Google designed this feature to help site owners comply with their own privacy policies and governing law.

38. When activated by website owners, the anonymization feature automatically adds a parameter to communications between the website user's computer and Google's server, which appears on the website's back-end code as the "aip" parameter:




39. Blue Shield did not activate Google's IP anonymization feature on its website. As a result, Google Analytics could see visitors' IP addresses and health-related online activity. And as shown below, at all relevant times, Blue Shield's website omitted the all-important "aip" parameter, indicating that IP anonymization was not enabled.

40. HIPAA regulations prohibit covered entities, including health insurance providers, from disclosing information related to an individual's "past, present, or future physical or mental health or condition, the provision of healthcare to the individual, or the past, present, or future payment for the provision of health care to the individual" when paired with specific kinds of identifying information. 45 C.F.R. § 160.103. Such information, when tied to identifying data, is "individually identifiable health information" and, when stored or transmitted electronically or otherwise, "protected health information" under HIPAA. *Id.*; 45 C.F.R. §164.514.

41. As relevant here, covered entities are prohibited from disclosing any such information in conjunction with a "geographic subdivision smaller than a state," a "device identifier" or "serial number," a "web universal resource locator[]," an "[i]nternet protocol (IP) address number," or "[a]ny other unique identifying number, characteristic, or code"—i.e., the exact identifiers collected by Google Analytics as a matter of course. 45 C.F.R. § 164.514.

42. As HHS explains in its HIPAA guidance, "if such [identifying information [is] listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[5]

43. Consistent with these regulations, Google even warns HIPAA-covered customers like Blue Shield that they "must not use Google Analytics in a way that implicates Google's access to, or collection of, PHI" and that both "[a]uthenticated pages" and "[u]nauthenticated pages that are related to the provision of health care services" are "likely to be HIPAA-covered" and that "customers *should not set Google Analytics tags*" on those pages.[6]

44. Despite these regulations and Google's warnings, Blue Shield nevertheless paired the collected information with identifying information, facilitating Google's interception of the search terms and selections enrollees made on its website when they accessed medical care. These search terms included, among other things, the specific medical conditions enrollees were experiencing, the specialty providers and treatments they needed, their physician preferences, and their location information—*i.e.*, information related to enrollees' past, present, or future physical or mental health and healthcare. This is one of many reasons why characterizing this sharing as a "breach" is a misnomer.

45. Blue Shield was on notice about the risks posed to its enrollees' privacy by Google Analytics. Blue Shield affirmatively agreed to Google Analytics' Terms of Service, which stated that

[5] HHS, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, hhs.gov (accessed September 11, 2024), https://perma.cc/BX66-6A6R.
[6] Google, *HIPAA and Google Analytics*, support.google.com (archived November 10, 2023), bit.ly/4gv7SoS (emphasis added).

Google "may retain and use … information collected" from Blue Shield's enrollees on its website.[7] Likewise, Blue Shield agreed to abide by Google's policies, *id*. at cl. 7, which expressly provide that Google "use[s] [site visitors'] information to deliver our services."[8]

46. Google Analytics is installed on the log in page for Blue Shield enrollees. When an enrollee clicks the link to log into Blue Shields' website, Blue Shield enables Google to intercept that log in contemporaneously together with specific information about the enrollee.

47. Blue Shield also affirmatively turned on a feature called "Google Signals" when it configured Google Analytics on its website. When Google Signals is enabled, Google can link the information it collects from Blue Shield enrollees while they browse Blue Shield's website to their Google Accounts (*e.g.*, Gmail accounts). This allows Google to tie enrollees' browsing activity to specific individuals.[9]

48. Google Analytics was also installed on enrollee account pages within Blue Shield's website and continued to track enrollees after they logged in. Accordingly, once an enrollee logged into Blue Shield's website, Google was permitted to pair any contemporaneously intercepted communications and identifiers with that user's status as a Blue Shield enrollee.

---

[7] Google, *Google Analytics Terms of Service*, marketingplatform.google.com (archived May 18, 2021), bit.ly/3XwECVO.

[8] Google, *Privacy Policy*, policies.google.com (archived May 18, 2021), https://bit.ly/4esTNGm.

[9] Google, "[UA] Activate Google signals [Legacy]," support.google.com/analytics/answer/7532985#zippy=%2Cin-this-article, (accessed September 28, 2025), https://perma.cc/E86S-BPAQ.

49. One of the key features of Blue Shield's website is its "Find a Doctor" page, which allows enrollees to find healthcare services by selecting categories like "alternative medicine," "pharmacies," and "mental health," as shown below:




50. Blue Shield facilitated Google's tracking of enrollees' text inputs and selections on the "Find a Doctor" page even when they were not logged into their member accounts.

51. The moment enrollees ran a search for a doctor, their personal information and search inputs were automatically shared with Google. The example below shows that when a search was run, Google collected the following information: (1) the user searched for **mental health** and **child psychiatry**, (2) the user selected the health plan **bronze tandem PPO**, (3) the user was a **subscriber** and **insured**, and (4) the user searched for providers in the **90210 zip code**.



52. Blue Shield's website also allowed Google to track enrollees' attempts to locate a particular physician or service. Using the website's "Find a Doctor" page, enrollees can use the search tool to filter doctors by location, specialty, name, or medical group. When an enrollee used these filters or selected a particular physician, those details were also automatically and concurrently transmitted to Google.

53. For example, as shown below, Blue Shield's website shared the following information with Google when a search was run: (1) that the user searched for providers with a specialty in **cardiology** and (2) that the enrollee selected a doctor named **Phillip Levine**.




54. Google also captured any search terms entered by enrollees into Blue Shield's site-wide search bar. For example, as shown below, when an enrollee types "Cardiology" into the search

bar, that information is concurrently intercepted by Google, along with that user's User-Agent[10] information and device information.




55. ECPA, HIPAA, and Blue Shield's own policies required Blue Shield to obtain visitors' express consent before sharing the contents of their health communications with third parties such as Google. Blue Shield never obtained that consent.

56. Plaintiffs and Class members had no notice that Blue Shield's website was tracking their communications and capturing their sensitive PHI with Google Analytics.

57. For one thing, Plaintiffs and Class members had no notice that Blue Shield's website was tracking their communications and capturing their sensitive and protected health information with Google Analytics. Blue Shield does not require users to read or agree to its HIPAA Notice or other privacy policies before using its website.

58. But even if it did, Blue Shield's various privacy notices on Blue Shield's website were vague as to the specific kinds of information collected. While Blue Shield's Privacy Policy referenced its use of "tracking technologies" on its site, the policy stated that these technologies are used only to "gather demographic information about our user base *as a* whole," or, even more vaguely, to "collect

[10] User-Agent is a string contained in the HTTP header that provides information about a user's browser and operating system to the server. Combined, the IP address and User-Agent information enables servers to uniquely identify a user, even if cookies are blocked.

information" or "infer interests."[11] Nowhere did Blue Shield explain that the contents of Plaintiffs' confidential communications regarding their health conditions, searches, zip codes, and addresses were being paired with the enrollee's unique IP address and User-Agent or other identifying information and being intercepted by third party Google (and, as described below, Meta). Notably, Blue Shield's failure to disclose its use of Google Analytics violated Analytics' Terms of Service, which required Blue Shield to expressly disclose its use of the software and how it processes and collects data. *See* Analytics Terms of Service, *supra*.

59. Blue Shield's various privacy notices were also contradictory. For example, in its Privacy Policy, Blue Shield pledged that "any personal information you provide . . . will be used only in ways consistent with" Blue Shield's HIPAA Notice. *Id*. The HIPAA notice, in turn, guaranteed that Blue Shield "*will not use your PHI for marketing purposes* without your prior written authorization." HIPAA Notice, *supra* (emphasis added). But in its Privacy Policy, Blue Shield directly contradicted itself, stating that its website automatically gathered identifying information, including "*internet protocol (IP) addresses*, browser type[s] . . . [and] device identifier[s]" which it "may combine . . . with *other information* we collect about you" to "improve *marketing*, *analytics*, or site functionality." Privacy Policy, *supra* (emphasis added). A reasonable user could not construe these conflicting policies to mean that Blue Shield was sharing their sensitive medical information.

60. Likewise, Blue Shield's Privacy Policy claimed to comply with "applicable laws and regulations," but it violated HIPAA and the Wiretap Act by using tracking software to wrongly facilitate the interception and disclosure of the contents of Plaintiffs' communications with its website, which included PII and PHI, to third parties without users' consent. Indeed, the fact that Blue Shield later disclosed the practice indicates that further disclosure was necessary.

61. Google viewed, accessed, and used the information it received from Blue Shield's website for its own purposes, including to provide advertising and other services to Blue Shield and other Google Analytics customers. Google's "Privacy & Terms" explains that "Google *uses* the information shared by sites and apps to deliver our services, maintain and improve them, develop new

[11] Privacy Policy (emphasis added).

services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on our partners' sites and apps."[12] Indeed, Plaintiffs have seen—and been subjected to—targeted ads associated with the treatments, conditions, and services they shared and searched for on Blue Shield's website.

## IV. Blue Shield's website transmitted its enrollees' PII and PHI to Meta.

62. In addition to the Google tracking technologies described above, since at least 2018, Blue Shield also embedded the Meta Pixel on its website.[13] The Meta Pixel is a snippet of code that allows site owners and web developers to identify, track, and understand user interactions on a website. According to Meta, this tracking tool helps website owners and developers understand how effective their advertising campaigns are and define custom audiences for targeted advertising campaigns on Facebook and Instagram.[14]

### A. How the Meta Pixel Works.

63. The Meta Pixel allows website owners and developers to track users on their website in order to find new customers or to advertise to users via Facebook and Instagram.[15]

64. The Meta Pixel is activated when website owners add the snippet of tracking code onto their website.

65. The Meta Pixel tracks users across different devices, browser sessions, and webpages using cookies containing unique identifiers and other identifying information including that which is related to the user's device, browser, or location. The Meta Pixel also collects users' PII and PHI.

66. The Meta Pixel has several methods of identifying individual users and their associated communications and behavior on a website: First, the Meta Pixel places cookies on users' web

[12] Google, *Privacy & Terms*, google.com (accessed March 20, 2024), https://perma.cc/W8KU-BAQR

[13] In February of 2022, Facebook Pixel changed its name to Meta Pixel and now works for both Facebook and Instagram advertising. Facebook and Instagram are social media platforms owned and operated by Meta.

[14] Meta, *Meta Pixel*, developers.facebook.com (captured September 19, 2025), https://perma.cc/4J7H-2ZPC.

[15] Meta Business Help Center, *About Meta Pixel*, facebook.com (captured September 19, 2025), https://perma.cc/HSC4-72FE.

browsers and associates each user's cookies with unique identifiers so that each user is distinguishable. Second, Meta collects identifying information about individual users' devices, browsers, geolocations, timestamps, IP addresses, User-Agents, and device properties. Third, Meta can use Advanced Matching, which collects customer information[16] (including contact information like names, email addresses, and phone numbers, plus other data, like gender, city, and zip code) alongside information about the actions taken on the website, called "Event Data."[17] Meta can use the identifying information it collects to distinguish between individual users and, where applicable, associate this data with users' Facebook or Instagram accounts.

67. Website owners like Blue Shield share "events" with Meta through the Meta Pixel as the user is communicating with the website. An event is an action taken by a user on the website. The Meta Pixel can track three different kinds of events: default, standard, and custom. Each type contains both identifying information and information about the user's communications with the website.

68. Default events are events Meta collects via the Meta Pixel automatically, such as whether a user viewed a particular page.

69. Standard events are created by Meta but activated by website owners. These events include tracking when a user completes a registration, makes a search, or views certain content, among other things.[18]

70. The Meta Pixel also allows website owners to configure custom events, which are non-standard events created by the website owner to measure specific kinds of user behavior. Website owners can assign unique names to custom events, such as whether a user clicked on a certain link on a website, filled out a form, or clicked a particular button on a webpage.

---

[16] Meta for Developers, *Customer Information Parameters*, developers.facebook.com (captured September 19, 2025), https://perma.cc/AR26-KPAD

[17] Meta defines "Event Data" as "other information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products." Meta, *Meta Business Tools Terms*, facebook.com (captured September 18, 2025), https://perma.cc/59LC-RDXE.

[18] Meta for Developers, *Reference: Standard Events*, developers.facebook.com (captured September 19, 2025), https://perma.cc/TA8E-Z6XD.

71. When configured, events can be used to define "custom audiences" to target with a digital advertising campaign. According to Meta, "[a] custom audience is an ad targeting option that lets you find your existing audiences among people across Meta technologies."[19] The custom audiences feature lets website owners identify a set of users who triggered certain events on the website. Then the website owner can ask Meta to place that user in a particular custom audience. For example, Blue Shield can ask Meta to place enrollees who complete a symptom survey in a custom audience so the Blue Shield can purchase ads from Meta targeting enrollees in that custom audience.

72. Event Data can also be used to define "lookalike audiences," which asks Meta to find potential new users who "look like" website owners' existing users because they "share similar characteristics" to a website owners' existing users.[20]

73. To summarize, website owners like Blue Shield can use events to give Meta detailed information about users, then purchase ad campaigns from Meta on Facebook and Instagram using that information. Moreover, Meta can use this intercepted information to profile users and deliver targeted advertisements to them, or to find new customers.

74. An additional feature of the Meta Pixel allows website owners to track "conversions," which monitor different users' interactions and behavior on a website or app to analyze the effectiveness of ads.[21] When used in tandem, event data defines the audience for the ad campaign, and conversions signal whether the ad is reaching the audience.

### B. Blue Shield's use of the Meta Pixel allowed Meta to track and identify individual enrollees in real time.

75. Blue Shield's deliberate deployment of the Meta Pixel on its website allowed Meta to collect event data about Blue Shield's enrollees and target ads through several methods, including lookalike or custom audiences.

[19] Meta, *About custom audiences*, facebook.com (captured September 19, 2025), https://perma.cc/U6YV-96G7.

[20] Meta, *About lookalike audiences*, facebook.com (captured September 19, 2025), https://perma.cc/99WG-HRSH.

[21] Meta, *Conversion Tracking*, developers.facebook.com (captured September 19, 2025), https://perma.cc/UD8C-MMBY.

76. For example, custom events can track individuals who started to create an account but did not finish, enrollees who logged into their accounts, or even enrollees who clicked on a button to call a healthcare provider. These groups can then be targeted as custom audiences for ad campaigns. Then, by tracking conversions, Blue Shield is able to analyze the effectiveness of its ad campaigns targeting these custom audiences on Facebook and Instagram.

77. The enrollee data on the Blue Shield website that was transmitted to Meta consisted of confidential communications, including information about enrollees' providers, health insurance information, and health concerns.

78. At the same time Meta was intercepting enrollees' confidential communications without their knowledge or consent, Meta was pairing these communications with the identifying information that was shared by Blue Shield about the individual enrollees.

### C. Meta tracked individual enrollees on Blue Shield's website through its first-party and third-party cookies.

79. "Cookies" were a key component of Meta's tracking on Blue Shield's website. Cookies come in two kinds: "first-party" cookies and "third-party" cookies.

80. First-party cookies are cookies owned by the website being visited, such as Blue Shield's cookies for a user visiting the Blue Shield website.

81. Third-party cookies are owned by a website *other than* the one being viewed or visited, such as Meta's cookies on the Blue Shield website.[22]

82. The Meta Pixel was configured by Blue Shield to use both kinds of cookies on Blue Shield's website. When an enrollee accessed Blue Shield's website, the Meta Pixel started tracking that enrollee automatically by placing first-party cookies on the enrollee's browser.

83. Meta also tracked enrollees using third-party cookies, which were placed on enrollees' browsers when they accessed Facebook or Instagram on their browsers or whenever they accessed a third-party website that had the Meta Pixel installed.

[22] *Id.*

84. The cookies were assigned unique identifiers to identify the individual enrollee's browsers, or devices, or to pair Blue Shield enrollees' information with their Facebook or Instagram accounts (if they were Facebook or Instagram users). These were used for tracking purposes, including targeted advertising.

85. The cookies Meta placed when users visited Blue Shield's website had different purposes, including tracking a particular enrollee across different webpages or sessions on the Blue Shield website. As described further below, Meta was able to place several cookies on the browsers of Blue Shield website enrollees, providing Meta with multiple ways to track those enrollees and distinguish them individually. That is, these cookies facilitate the targeting of patients based on their medical conditions and care taken to address them.

86. Meta's various cookies enabled it to identify individual enrollees even if they weren't logged into Facebook or Instagram account when browsing Blue Shield's website. Meta used a combination of cookies, browser and device information, and Advanced Matching to automatically link an enrollee's Facebook or Instagram profile with the set of data communicated by enrollees on the Blue Shield website, which consisted of confidential communications and enrollees' PII and PHI.

87. By installing the Meta Pixel on its website, Blue Shield facilitated Meta's interception of enrollees' private and confidential communications, as well as their PII and PHI, and enabled Meta to identify enrollees with their Facebook or Instagram accounts for advertisers.

**a. The first-party cookie employed by Meta on Blue Shield's website did not require an enrollee to be logged into their Facebook or Instagram account to identify them.**

88. Many browsers and privacy browser extensions have started to block third-party cookies from tracking users across the web. Meta's ability to disguise some of its cookies as first-party cookies for users visiting websites like Blue Shield allowed Meta to defeat these blockers, resulting in more effective enrollee tracking for advertising purposes.

89. One first-party cookie Meta created for tracking purposes is called the _fbp cookie. When the Meta Pixel is installed on a website and first-party cookies are enabled, the Pixel automatically saves the _fbp cookie for the website. Each _fbp cookie is assigned a unique, random

string of numbers, in order to follow a particular enrollee across different webpages on Blue Shield's website.[23]

90. As seen below, the Blue Shield website enabled the _fbp cookie to track individual enrollees across the Blue Shield website, even for those enrollees who cleared third-party cookies, used cookie-blockers, or used browsers that disabled third-party cookies.




91. The _fbp cookie stores a unique identifier for a specific browser, allowing Meta to track a user across a website and attribute certain events to that user for advertising purposes even if the user is not logged into their Facebook or Instagram account on that browser.

92. Meta accomplishes this tracking in two ways. First, if an enrollee has ever logged into Facebook or Instagram on the same browser as the Blue Shield website, Meta ties its Facebook or Instagram-specific cookies to that enrollee's _fbp cookie value, associating the cookies with each other.

[23] Meta for Developers, *ClickID and the fbp and fbc Parameters*, developers.facebook.com (captured September 19, 2025), https://perma.cc/B9TM-YMKQ.

93. Second, Meta can identify Facebook or Instagram users via the _fbp cookie by pairing the _fbp cookie with the IP address, User Agent, and device properties associated with the enrollee. By associating Facebook and Instagram accounts with information associated with _fbp cookie values, Meta can identify Facebook or Instagram users browsing the website even if the enrollee has never logged into Facebook or Instagram on the same browser as the Blue Shield website.

94. Meta's tracking continues even if a Blue Shield enrollee clears third-party cookies from their browser, since the _fbp cookie is configured to appear as a first-party cookie implemented by Blue Shield, rather than a Meta cookie. Because Blue Shield configured Meta Pixel to install the _fbp cookie on its website, Meta continued to intercept enrollees' communications even if the enrollee blocked or cleared third-party cookies from their browser.

95. Meta's own privacy policy explains how its cookies operate on websites like Blue Shield's to track users who don't have Facebook or Instagram accounts (or who are not logged in):

> "Our business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook or Instagram account or are logged in. Specifically, cookies named _fbc or _fbp may be set on the domain of the business partner whose site you're visiting. Unlike cookies that are set on Meta's own domains, these cookies aren't accessible by Meta when you're on a site other than the one on which they were set, including when you are on one of our domains. They serve the same purposes as cookies set in Meta's own domain, which are to personalise content (including ads), measure ads, produce analytics and provide a safer experience, as set out in this Cookies Policy."[24]

96. Blue Shield implemented the first-party _fbp cookie on its website to allow Meta to personally identify users who were not logged into their Facebook or Instagram accounts, since each enrollee had a unique cookie value associated with their browser.

**b. Meta also used third-party cookies to track enrollees.**

97. In addition to first-party cookies like the _fbp cookie, the Meta Pixel delivers third-party cookies to users' browsers with unique identifiers, including the datr cookie and fr cookie.[25]

---

[24] Meta, *Cookie Policy,* Manage your privacy on Facebook, Instagram and Messenger, mbasic.facebook.com (captured September 19, 2025), https://perma.cc/2W92-386K.
[25] *Id*.

These cookies are tied to individual browsers and therefore, like the _fbp cookie, do not require an enrollee to be logged into their Facebook or Instagram accounts for Meta to individually identify them.

98. Meta (through the Meta Pixel) also places the c_user cookie on users' browsers. This cookie identifies Facebook users. And it's especially sensitive, because it is identical to a user's Facebook ID number—it's even visible in the source code of a user's Facebook page. Practically, that means that if a c_user cookie appears in the Meta Pixel's tracking information, anyone can easily identify an individual Facebook user profile by simply copying that cookie value and pasting it into a browser after the Facebook.com website domain.[26] For example, if an individual's c_user cookie value was 4, anyone could use that number to identify that individual user by typing "facebook.com/4" into a web browser.

99. Unlike Meta's other cookies (*e.g.*, _fbp, datr, and fr cookies), the c_user cookie requires a Facebook user to have logged into Facebook within one year on the same browser as the website employing the Meta Pixel for Meta to be able to identify the website user with their Facebook account.

100. Meta's third-party cookies (datr, fr, and c_user) tracked Blue Shield enrollees and linked them to Facebook or Instagram accounts.

---

[26] *Id.*

101. The datr, fr, and c_user cookies and their values were placed and tracked for users of Blue Shield's website during the relevant period. As shown below, these cookies appear when a user searches for individual family health plans:




102. Together, these cookies, enabled by the Meta Pixel and placed on enrollee's browsers, were automatically associated with the enrollee while he or she used the Blue Shield website.[27] This automatic association allowed Meta to track and uniquely identify an enrollee on Blue Shield's website while they were using it. The enrollee's confidential communications regarding their health insurance plan were also transmitted to Meta, alongside the cookie values associated with that enrollee. In other words, Meta not only tracked individual enrollees through the use of these cookies, but it also concurrently received the content of the enrollee's confidential communications with Blue Shield.

[27] Meta, *Cookie Policy, Manage your privacy on Facebook, Instagram and Messenger*, mbasic.facebook.com (captured September 19, 2025), https://perma.cc/2W92-386K.

**D. The Meta Pixel on Blue Shield's website also transmitted enrollees' PII and PHI in real time in other ways.**

103. Another way Blue Shield facilitated Meta's interception of enrollees' confidential communications, PII, and PHI was through "Button Click Data," which tracked when site visitors clicked buttons, the labels on those buttons, and the resulting pages users landed on.[28] As seen below, when an enrollee clicked on the "Obstetrics/Gynecology" button, Meta automatically received and viewed this highly sensitive PHI and PII without the user's knowledge or consent. Note that the same page tracked enrollees' _fbp cookies, which allows Meta to tie the Button Click Data to a specific enrollee.




[28] Meta, *Meta Pixel*, developers.facebook.com (captured September 19, 2025), https://perma.cc/4J7H-2ZPC.

104. Blue Shield helped Meta automatically intercept this enrollees' sensitive medical information and confidential communications related to their healthcare treatment along with their PII. Meta could then, in real-time, associate that enrollee with Facebook or Instagram accounts, even if the enrollee was not logged into Facebook or Instagram on the same browser.

105. Blue Shield also automatically shared information about providers and the ways a Blue Shield enrollee interacted with, contacted, or otherwise searched for certain providers. Blue Shield transmitted sensitive information about the particular health conditions a Blue Shield enrollee was experiencing to Meta, unbeknownst to users, because Meta was able to intercept the details of an enrollee's treatment, including the specific healthcare providers or specialists the enrollee searched for or contacted. As seen here, when the enrollee clicked on the button to call the particular provider, Meta received information about the providers' name and the button the enrollee selected.




106. Moreover, when an enrollee filled out a form on the Blue Shield website with several fields of PII, that information was automatically transmitted to Meta as the form field values:




107. Blue Shield also configured the Meta Pixel code on its website to transmit information with custom data, which was automatically shared with Meta while an enrollee accessed certain webpages and communicated their PII and PHI with Blue Shield. This custom data included information about enrollees' insurance plans, membership information, doctor and specialty searches, and possible health conditions. Much of this data consists of highly sensitive PHI and PII, counter to Blue Shield's assurances to its enrollees. This information was shared with Meta alongside the enrollees' PII because Blue Shield configured the Meta Pixel code on its website to share this information specifically for targeted advertising purposes.

108. For example, as seen below, the custom data configured on Blue Shield's website automatically shared with Meta details of the enrollees' health insurance, including their specific plan

information, whether they were insured at all, whether their plan was a PPO, and other highly sensitive and specific information when the enrollee accessed the Find a Doctor page.




109. To summarize, the Meta Pixel provided Meta with multiple methods of tracking enrollees on the Blue Shield website, including enrollees not logged into their Facebook or Instagram accounts.

110. Using cookies, IP addresses, User Agents, device properties, Advanced Matching, and custom information (e.g., Button Click Data), Meta intercepted large amounts of data from enrollees and individually identified them as they accessed and used Blue Shield's website.

111. Meta's ability to distinguish between individual enrollees, when coupled with the highly sensitive and confidential communications it intercepted, allowed it to pair enrollees' PII and PHI with identifying information.

**E. Blue Shield deployed the Meta Pixel on its website to increase its profits without obtaining the consent of Plaintiffs or class members.**

112. There was no legitimate medical purpose for Blue Shield to share this data with Meta. Blue Shield did it to purchase advertising, optimize its advertising, and target existing and new customers. Blue Shield did this despite assuring enrollees in its HIPAA Notice, consistent with HIPAA, that it would not. In the process, Blue Shield also ignored Meta's terms, which prohibit developers from sharing health or sensitive information with Meta via the Meta Pixel.[29]

113. Moreover, Blue Shield used the Meta Pixel to create lookalike and custom audiences and track conversions, allowing Blue Shield to target enrollees and potential new customers with ads on Facebook and Instagram.

114. Meta's Terms prohibits developers from using the Meta Pixel code to share data "that includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[30] But Blue Shield programmed the Meta Pixel on its website to transmit enrollees' sensitive PII and PHI to Meta anyway.

---

[29] See Meta Business Help Center, *About prohibited information*, facebook.com (captured September 19, 2025), https://perma.cc/UU7J-HVP9.

[30] Meta, *Meta Business Tools Terms*, facebook.com (captured September 18, 2025), https://perma.cc/59LC-RDXE.

115. Blue Shield never asked for or received enrollees' consent to share their PII and PHI with Google, Meta, or any other third parties, in contravention of federal HIPAA regulations and California law.[31]

**V. Blue Shield's wrongful disclosure harmed Plaintiffs and other class members.**

116. In the age of the internet, personal data—and particularly health information—has enormous value. The tech industry's largest players actively monetize the collection, sale, and use of consumer data. And health data is generally considered to be the most valuable—some health records are worth as much as $1,000 on the dark web.[32]

117. Healthcare organizations, like Blue Shield, sell health information to a variety of market players, including advertising platforms, pharmaceutical companies, researchers, and data brokers.[33] Pharmaceutical companies use health information to "understand patient behaviors," and to "empower salesforce to market drugs more effectively," while advertising platforms, like Google and Meta, use such data "to allow for more precise ad targeting."[34] Some estimates place the value of individual medical records at up to $125, and entire health databases have sold for up to $500,000.[35]

118. When healthcare data is sold legally, HIPAA requires such information be de-identified (*e.g.*, IP addresses removed) or shared only with the patient's express prior consent. 45 C.F.R. § 164.514.

119. Medical information is also extremely private. As one National Institutes of Health report explained, "[w]hen personally identifiable health information . . . is disclosed to an employer,

[31] Steve Alder, *One-third of Healthcare Websites Still Use Meta Pixel Tracking Code*, HIPAA Journal (April 5, 2024), https://perma.cc/5U2Z-9JLK.
[32] Sanjay Cherian, *Healthcare Data: The Perfect Storm*, Forbes.com (January 14, 2022), https://perma.cc/898S-F6UF.
[33] Todd Zigrang and Jessica Bailey-Wheaton, *Valuing Healthcare Data*, The Value Examiner, July-August 2023, at 35 (available online at https://perma.cc/ZX9X-KN7W).
[34] *Id.*
[35] Carol Gibbons, *What is the Price of a Medical Record?* medicaleconomics.com (July 15, 2017), https://perma.cc/2GH8-4SRA.

insurer, or family member, it can result in stigma, embarrassment, and discrimination."[36] Because of this, "without some assurance of privacy, people may be reluctant to provide candid and complete disclosures of sensitive information even to their physicians."[37]

120. Given the value and sensitivity of personal health information, federal regulators have increasingly cracked down on companies that misuse data. In July 2022, the FTC stated that it was "committed to fully enforcing the law against illegal use and sharing of highly sensitive data."[38]

121. Blue Shield ignored its obligations to keep enrollees' PII and PHI safe by helping Google and Meta surreptitiously intercept Plaintiffs' and Class members' valuable medical information. In the process, Blue Shield deprived Plaintiffs and those similarly situated of the value of their personal information. Blue Shield further denied Plaintiffs the ability to choose how, when, and with whom their data was shared. Now, Plaintiffs' communications with Blue Shield's website, including search terms related to sensitive health conditions, physician preferences, and needed treatments, are irretrievably in Google's and Meta's hands.

122. Blue Shield's conduct also undermined Plaintiffs' relationships with their healthcare providers. Because of Blue Shield's actions, they cannot interact with physicians or seek treatment through Blue Shield's website without fearing that their sensitive information is being automatically shared with unknown third parties and for uses to which they do not consent. Plaintiffs were subjected to targeted and personalized advertisements based on the PHI and PII intercepted by Google and Meta. And Plaintiffs have experienced emotional distress in the knowledge that the sensitive health information they communicated to Blue Shield's website was automatically shared with the world's largest tech companies, Google and Meta.

---

[36] Sharyl J. Nass, et al., eds., *Beyond the HIPAA Privacy Rule*, ncbi.nlm.nih.gov (accessed Nov. 13, 2023), https://perma.cc/SBR9-3C43.

[37] *Id.*

[38] Kristen Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*," FTC.gov (July 11, 2022), https://perma.cc/U53L-B4EY.

## VI. Plaintiff-specific Allegations

### A. Austin Kahn's experience with Blue Shield's website

123. Plaintiff Kahn is a Class member and is currently and has been an enrollee of Blue Shield of California's insurance plans since approximately 2019. Plaintiff Kahn has received medical care covered by Blue Shield on a regular basis since at least 2019.

124. In order to obtain medical care, treatment, and/or information from Blue Shield, Plaintiff Kahn logged in and used Blue Shield's website on his desktop computer, laptop computer, and mobile phone.

125. Plaintiff Kahn did not consent to Blue Shield sending his PII and PHI to Google for targeted advertising, marketing purposes, or otherwise.

126. Plaintiff Kahn provided and communicated his PII and PHI to Blue Shield when he used the website, which included intimate and sensitive health data, specifically to register for an account, find a doctor, use telehealth services, search the prior authorization list, complete online forms, make payments, review billing statements or claim summaries, and search for member discounts, among other uses, beginning in 2019 and continuing to the present.

127. For example, Plaintiff Kahn searched for specialists for his specific and sensitive healthcare needs on the "Find a Doctor" webpage. He also shopped or searched for alternative plans and reviewed his Explanation of Benefits. Plaintiff Kahn also looked for billing information regarding his treatments on the website.

128. Plaintiff Kahn used the Blue Shield website to schedule and receive treatment and specialty referrals for medical symptoms and conditions. He was referred to and received medical treatment, communications, and/or information in relation to his symptoms through the Blue Shield website.

129. In doing so, he communicated with Blue Shield and its agents via its website, and reasonably expected that—as a subscriber of Blue Shield's and a patient seeking treatment—his communications and PHI were confidential and would not be received by Google, and other unknown

third parties, or used for marketing purposes, without his knowledge or consent. That was not the case.

130. Upon entering his private information and intimate health data, his requests and the contents of his communications on Blue Shield's website were automatically sent to Google alongside his device information, IP address, User Agent, and personal cookies, Google Client ID, and additional personal identifiers, which revealed to those third parties his real-world identity.

131. Plaintiff Kahn is a Google accountholder and regularly accessed his Gmail account. He is also an Instagram user.

132. Plaintiff Kahn did not receive notice and had no opportunity to consent to the disclosure of his PII and PHI from the Blue Shield website to Google and other third parties for their benefit.

133. The information obtained by Blue Shield from Plaintiff Kahn and shared with Google and other third parties consisted of sensitive medical and otherwise private information that Plaintiff Kahn would not have disclosed had he known the information would be transmitted to Google and other unknown third parties.

134. As described above, Google obtained Plaintiff Kahn's communications with Blue Shield (and PII and PHI embedded in those communications) automatically via Google Analytics. This was a direct result of Blue Shield installing Google Analytics code and using that tool on the Blue Shield website it encouraged its enrollees, including Plaintiff Kahn, to use in conjunction with obtaining medical care. Google was thereby able to connect and associate it with other information in its possession and for retargeting and other marketing purposes and track and profile Plaintiff Kahn.

135. Plaintiff Kahn has a continuing interest in ensuring that future communications with Blue Shield are protected and safeguarded from future unauthorized disclosure and knowing the precise categories of information disclosed, to whom it was disclosed, and why it was disclosed.

136. Blue Shield knew it was disclosing Plaintiff Kahn's sensitive PII and PHI to Google and other third parties, which was used for targeted advertising and marketing purposes, in

contravention of its representations to all its website users, and in contravention of Google's own policies regarding use of its tracking tools.

137. Plaintiff Kahn suffered damages in the form of (i) invasion of privacy; (ii) statutory damages; (iii) the continued and ongoing risk to his PII and PHI, which remains in Blue Shield's possession and is subject to further disclosure so long as it fails to undertake appropriate and adequate measures to protect the personal information in its possession, and associated costs; (iv) the continued and ongoing risk of harassment, and targeted advertisements specific to Plaintiff Kahn's medical conditions and other confidential information he communicated to Blue Shield via its website; (v) time spent reviewing and responding to the Notice of Data Breach sent by Blue Shield; and (vi) the emotional distress, shame, and embarrassment of having his personal health information revealed to Google and other third parties without his knowledge or consent.

**B. Rachel Markovitz's experience with Blue Shield's website**

138. Plaintiff Markovitz is a Class member and is currently and has been an enrollee of Blue Shield's insurance plans since 2022. Plaintiff Markovitz has received medical care covered by Blue Shield on a regular basis since 2022.

139. In order to obtain medical care, treatment, and/or information from Blue Shield, Plaintiff Markovitz logged in and used Blue Shield's website on her desktop computer, laptop computer, and mobile phone.

140. Plaintiff Markovitz did not consent to Blue Shield sending her PII and PHI to Google and Meta for targeted advertising, marketing purposes, or otherwise.

141. Plaintiff Markovitz provided and communicated her PII and PHI to Blue Shield when she used its website, which included intimate and sensitive medical data, specifically to register for an account, find a doctor, review billing statements or claim summaries, among other uses, beginning around 2022 and continuing to the present.

142. For example, Plaintiff Markovitz searched for in-network providers on the "Find a Doctor" webpage on Blue Shield's website. She also clicked on the "Explore care options" button and webpage to learn about urgent care options and made searches regarding prior authorizations.

143. Plaintiff Markovitz used the Blue Shield website to schedule and receive treatment and specialty referrals for medical symptoms and conditions. She was referred to and received medical treatment, communications, and/or information in relation to her symptoms through the Blue Shield website.

144. In doing so, she communicated with Blue Shield and its agents via the website and reasonably expected that—as a subscriber of Blue Shield's and a patient seeking treatment—her communications and PHI were confidential and would not be received by Google, Meta, or any other third parties, or used for marketing purposes, without her knowledge or consent. That was not the case.

145. Upon entering her private information and intimate health data, her requests and the contents of her communications on Blue Shield's website were automatically sent to Google and Meta alongside her device information, IP address, User Agent, and personal cookies, Google Client ID, Facebook ID, and additional personal identifiers, which revealed to those third parties her real-world identity.

146. Plaintiff Markovitz is a Google accountholder and regularly accessed her Gmail account. She is also a Facebook and Instagram user.

147. Plaintiff Markovitz did not receive notice and had no opportunity to consent to the disclosure of her PII and PHI from the Blue Shield website to Google, Meta, and other third parties for their benefit.

148. The information obtained by Blue Shield from Plaintiff Markovitz and shared with Google, Meta, and other third parties consisted of sensitive medical and otherwise private information that Plaintiff Markovitz would not have disclosed had she known the information would be transmitted to Google, Meta, and other unknown third parties.

149. As described above, Google and Meta obtained Plaintiff Markovitz's communications with Blue Shield (and PII and PHI embedded in those communications) automatically via Google Analytics and the Meta Pixel, respectively. This was a direct result of Blue Shield installing Google Analytics and the Meta Pixel code and using those tools on the Blue Shield website it encouraged its

enrollees, including Plaintiff Markovitz, to use in conjunction with obtaining medical care. Google and Meta were thereby able to connect and associate it with other information in its possession and for retargeting and other marketing purposes and track and profile Plaintiff Markovitz.

150. Plaintiff Markovitz has a continuing interest in ensuring that future communications with Blue Shield are protected and safeguarded from future unauthorized disclosure and knowing the precise categories of information disclosed, to whom it was disclosed, and why it was disclosed.

151. Blue Shield knew it was disclosing Plaintiff Markovitz's sensitive PII and PHI to Google, Meta, and other third parties, which was used for targeted advertising and marketing purposes, in contravention of its representations to all its website users, and in contravention of Google and Meta's own policies regarding use of their tracking tools.

152. Plaintiff Markovitz suffered damages in the form of (i) invasion of privacy; (ii) statutory damages; (iii) the continued and ongoing risk to her PII and PHI, which remains in Blue Shield's possession and is subject to further disclosure so long as it fails to undertake appropriate and adequate measures to protect the personal information in its possession, and associated costs; (iv) the continued and ongoing risk of harassment, and targeted advertisements specific to Plaintiff Markovitz's medical conditions and other confidential information she communicated to Blue Shield via its website; (v) time spent reviewing and responding to the Notice of Data Breach sent by Blue Shield; and (vi) the emotional distress, shame, and embarrassment of having her personal health information revealed to Google, Meta, and other third parties without her knowledge or consent.

### C. Susan Reiman's experience with Blue Shield's website

153. Plaintiff Reiman is a Class member and was an enrollee of Blue Shield's insurance plans between 1978 and 2018 or 2019. Plaintiff Reiman received medical care covered by Blue Shield on a regular basis between 1978 and 2018 or 2019.

154. In order to obtain medical care, treatment, and/or information from Blue Shield, Plaintiff Reiman logged in and used Blue Shield's website on her desktop computer, laptop computer, and mobile phone.

155. Plaintiff Reiman did not consent to Blue Shield sending her PII and PHI to Google and Meta for targeted advertising, marketing purposes, or otherwise.

156. Plaintiff Reiman provided and communicated her PII and PHI to Blue Shield when she used its website, which included intimate and sensitive medical data, specifically to register for an account, find a doctor, review billing statements or claim summaries, among other uses, beginning around December of 2013 and continuing to 2023 or 2024.

157. For example, Plaintiff Reiman used the "Find a Doctor" webpage to search for in-network providers regarding her sensitive healthcare and treatment. She also used the NurseHelp 24/7 tool to ask a registered nurse a question. Plaintiff Reiman completed online forms on Blue Shield's website and made searches for member discounts while logged into the Blue Shield website. Plaintiff Reiman continued to use the Blue Shield website even after her healthcare coverage ended in 2018 or 2019 to retrieve medical records and billing information.

158. Plaintiff Reiman used the Blue Shield website to schedule and receive treatment and specialty referrals for medical symptoms and conditions. She was referred to and received medical treatment, communications, and/or information in relation to her symptoms through the Blue Shield website. She also used the website to file a claim, make payments, review billing statements.

159. In doing so, she communicated with Blue Shield and its agents via the website and reasonably expected that—as a subscriber of Blue Shield's and a patient seeking treatment—her communications and PHI were confidential and would not be received by Google, Meta, or any other third parties, or used for marketing purposes, without her knowledge or consent. That was not the case.

160. Upon entering her private information and intimate health data, her requests and the contents of her communications on Blue Shield's website were automatically sent to Google and Meta alongside her device information, IP address, User Agent, and personal cookies, Google Client ID, Facebook ID, and additional personal identifiers, which revealed to those third parties her real-world identity.

161. Plaintiff Reiman is a Google accountholder and regularly accessed her Gmail account. She is also a Facebook user.

162. Plaintiff Reiman did not receive notice and had no opportunity to consent to the disclosure of her PII and PHI from the Blue Shield website to Google, Meta, and other third parties for their benefit.

163. The information obtained by Blue Shield from Plaintiff Reiman and shared with Google, Meta, and other third parties consisted of sensitive medical and otherwise private information that Plaintiff Reiman would not have disclosed had she known the information would be transmitted to Google, Meta, and other unknown third parties.

164. As described above, Google and Meta obtained Plaintiff Reiman's communications with Blue Shield (and PII and PHI embedded in those communications) automatically via Google Analytics and the Meta Pixel, respectively. This was a direct result of Blue Shield installing Google Analytics and the Meta Pixel code and using those tools on the Blue Shield website it encouraged its enrollees, including Plaintiff Reiman, to use in conjunction with obtaining medical care. Google and Meta were thereby able to connect and associate it with other information in its possession and for retargeting and other marketing purposes and track and profile Plaintiff Reiman.

165. While she was a Blue Shield member, Plaintiff Reiman had an interest in ensuring that her communications with Blue Shield were protected and safeguarded from future unauthorized disclosure and knowing the precise categories of information disclosed, to whom it was disclosed, and why it was disclosed.

166. Blue Shield knew it was disclosing Plaintiff Reiman's sensitive PII and PHI to Google, Meta, and other third parties, which was used for targeted advertising and marketing purposes, in contravention of its representations to all its website users, and in contravention of Google and Meta's own policies regarding use of their tracking tools.

167. Plaintiff Reiman suffered damages in the form of (i) invasion of privacy; (ii) statutory damages; (iii) the continued and ongoing risk to her PII and PHI, which remains in Blue Shield's possession and is subject to further disclosure so long as it fails to undertake appropriate and adequate

measures to protect the personal information in its possession, and associated costs; (iv) the continued and ongoing risk of harassment, and targeted advertisements specific to Plaintiff Reiman's medical conditions and other confidential information she communicated to Blue Shield via its website; (v) time spent reviewing and responding to the Notice of Data Breach sent by Blue Shield; and (vi) the emotional distress, shame, and embarrassment of having her personal health information revealed to Google, Meta, and other third parties without her knowledge or consent.

## CLASS ACTION ALLEGATIONS

168. Plaintiffs incorporate all prior allegations.

169. Plaintiffs bring this action individually and on behalf of a class (the "Class") under Federal Rule of Civil Procedure 23.

170. Like Plaintiffs, Class members are Blue Shield enrollees who used Blue Shield's website and related webpages to search for doctors, health conditions, symptoms, and/or treatments. The confidential content of Plaintiffs' and Class members' communications with Blue Shield's website was automatically intercepted by Google and Meta without Plaintiffs' and Class members' consent. The intercepted information included intimate details about enrollees' health—content that is highly private and protected by federal and state law. On information and belief, the contents of these communications were paired with identifying information. Blue Shield is thus liable to Plaintiffs and Class members for violating their rights under federal law.

171. Plaintiffs seek to certify the following Class:

> All United States residents who, during the Class Period, were Blue Shield enrollees and had their PII and/or PHI disclosed to Google and/or Meta via the Blue Shield website.

172. The Class Period is 2012 to 2025, or the period during which Google Analytics and/or the Meta Pixel were installed on Blue Shield's website.[39]

[39] Plaintiffs reserve the right to amend the Class Period upon discovery of the exact dates of deployment of Google and Meta's tracking technologies on Blue Shield of California's website.

173. Specifically excluded from the Class are Blue Shield's officers, directors, employees, and agents; any entity in which Blue Shield has a controlling interest; and affiliates, legal representatives, attorneys, successors, heirs, or assigns of Blue Shield. Also excluded from the Class is any judicial officers to whom this case is assigned, their families, and members of their staff.

174. Plaintiffs reserve the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

175. **Numerosity**: The members of the Class are so numerous that joinder of all members of the Class is impracticable. The proposed Class contains at least hundreds of thousands of individuals whose health information was intercepted by Google and/or Meta through Blue Shield's website.

176. **Predominance**: There are questions of law and fact common to all Class members that predominate over any questions affecting only individual Class members. These common questions include:

a. Whether Blue Shield, by installing Google Analytics and the Meta Pixel on its website, procured Google and Meta to automatically intercept the PII and PHI of Plaintiffs and Class members, which Plaintiffs and Class members communicated to Blue Shield through its website;

b. Whether, through Google Analytics and the Meta Pixel, Plaintiffs and Class members' PII and PHI were intercepted and transmitted to Google and Meta while the communications on Blue Shield's website were taking place;

c. Whether Blue Shield used Google Analytics and/or the Meta Pixel as device(s) to intercept Plaintiffs and Class members' communications with Blue Shield's website without their consent;

d. Whether Blue Shield violated Plaintiffs' and Class members' privacy rights;

e. Whether Blue Shield violated the Wiretap Act;

f. Whether Plaintiffs and Class members are entitled to injunctive and equitable relief;

g. Whether Plaintiffs and Class members are entitled to actual, compensatory, statutory, or punitive damages, statutory penalties, or restitution, as allowable by law.

177. **Typicality**: Plaintiffs' claims are typical of the claims of the Class members, arising from the same conduct by Blue Shield involving the use of Google Analytics and the Meta Pixel and based on the same legal theories.

178. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class members. Plaintiffs' counsel are competent and experienced in litigating complex and mass actions.

179. **Superiority**: A class action is a superior method for the fair and efficient adjudication of this case. This proposed class action presents fewer management difficulties than individual litigation and will permit an orderly and expeditious administration of the Class claims, fostering economies of time, effort, and expense. If the Class members are forced to bring individual suits, the transactional costs, including those incurred by Blue Shield, will significantly increase, and the courts will be clogged with a multiplicity of lawsuits involving identical subject matter, fact patterns, and legal issues.

180. **Injunctive and Declaratory Relief**: Blue Shield has acted or refused to act on grounds generally applicable to the Class, thereby making it appropriate for this Court to grant injunctive and corresponding declaratory relief with respect to the Class as a whole.

## TOLLING OF THE STATUTES OF LIMITATIONS

181. All applicable statute(s) of limitations have been tolled by Blue Shield's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could not have reasonably discovered Blue Shield's practices of sharing their PHI and PII with Google and Meta using a piece of programming code until shortly before this class action litigation commenced.

182. Blue Shield was and remains under a continuing duty to disclose to Plaintiffs and Class members its practice of sharing PHI and PII to Google and Meta. As a result of the active

concealment by Blue Shield, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLAIM FOR RELIEF

### Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* (On Behalf of Plaintiffs and the Class against Blue Shield)

183. Plaintiffs incorporate all prior allegations.

184. The federal Wiretap Act, as amended by ECPA, generally prohibits the interception of wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

185. Specifically, a violation of the Wiretap Act occurs when any person:

a. "[I]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a);

b. "[I]ntentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication" in violation of the Act. 18 U.S.C. § 2511(1)(c); or

c. "[I]ntentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication" in violation of the Act. 18 U.S.C. § 2511(1)(d).

186. In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

187. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

188. Content "includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

189. The Wiretap Act protects both the sending and receipt of communications.

190. The Wiretap Act provides a private right of action to any person whose wire, oral or electronic communication is intercepted, disclosed, or intentionally used. 18 U.S.C. § 2520(a).

191. Plaintiffs' and Class members' health-related communications transmitted via Blue Shield's use of Google Analytics and the Meta Pixel on its website are "electronic communications" under the Wiretap Act. These communications include the "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12). The statutory history of the Wiretap Act shows that it was intended to prevent those creating the infrastructure for communications from also eavesdropping to collect the information communicated for their own purposes.

192. By installing Google Analytics and the Meta Pixel on its website, Blue Shield violated the Wiretap Act because it enabled third parties Google and Meta to intercept the contents of Plaintiffs' and Class members' confidential health communications during transmission, and prior to entering electronic storage.

193. Google Analytics and the Meta Pixel are "electronic, mechanical, or other device[s]" installed by Blue Shield on its website to intercept the contents of electronic communications because they are tracking services used to intercept electronic communications. 18 U.S.C. § 2510(4).

194. Blue Shield intended to facilitate Google and Meta's interception of Plaintiffs' and Class members' data. Blue Shield installed Google Analytics and the Meta Pixel code on its website, configured in a way that allowed Google and Meta to access and track enrollees' sensitive, health-related communications through the website, including on the "Find a Doctor" page, doctors'

webpages, and sitewide search bar, even after they were logged into member-only webpages on the Blue Shield website. Google Analytics and the Meta Pixel cannot access a webpage unless they are affirmatively installed by a website owner. Thus, by installing Google Analytics and the Meta Pixel—wiretapping devices—on its website, including on webpages accessed after an enrollee logs in, Blue Shield intentionally procured Google and Meta to intercept or endeavor to intercept Plaintiffs' and Class members' electronic communications without their authorization or consent.

195. Through the use of these devices that Blue Shield installed on its website, Google and Meta acquired Plaintiffs' and Class members' electronic communications during transmission. Each time Plaintiffs and Class members entered a search term, clicked on a filter, or accessed their enrollee-only account pages by logging in, Google Analytics and the Meta Pixel automatically and contemporaneously intercepted those communications, which enabled Google and Meta to capture Plaintiffs' and Class members' confidential communications with Blue Shield's website while they were being received by the Blue Shield website.

196. Through the use of Google Analytics and the Meta Pixel that Blue Shield installed on its website, Google and Meta acquired the contents of Plaintiffs' and Class members confidential, health-related communications, including "information concerning the substance, purport, or meaning" of those communications. 18 U.S.C. § 2510(8). For example, Google and Meta intercepted the URLs revealing Plaintiffs' and Class members' search terms and inputs, Button Click Data, form field values, and other confidential content. This content related to Plaintiffs' and Class members' past, present, or future health and healthcare—including the treatments Plaintiffs and Class members were seeking, the names of healthcare providers, information about their healthcare plans or subscriptions, symptoms, and health-related search terms

197. The information described above that Blue Shield procured Google and Meta to intercept, or to endeavor to intercept, was also individually identifiable health information, because it related to Plaintiffs' and Class members' physical and mental health, treatment, and payment for medical services, 45 C.F.R. §160.103, and was paired with unique identifying information, including IP addresses, User-Agents, device identifiers, location information, and other distinctive codes (e.g.,

cookies). 45 C.F.R. §164.514. Because this information was transmitted by electronic media from a covered entity—Blue Shield—to Google and Meta, this information was also PHI. 45 C.F.R. §160.103.

198. Plaintiffs and Class members did not authorize Blue Shield to procure Google or Meta to intercept, or to endeavor to intercept, the contents of their communications on Blue Shield's website, and they did not consent to the use of Google Analytics or the Meta Pixel to acquire those communications for any purpose, including to invade their privacy. Rather, Plaintiffs and Class members had a reasonable expectation that the treatment specialties, medical conditions, physician names, and other health-related information they shared with Blue Shield's website would not be intercepted or acquired by Google or Meta, particularly when they were logged into the site, because they were communicating with their health insurance company about their past, present, or future healthcare, physical or mental conditions, and payment for those services.

199. Plaintiffs and Class members did not consent to Google's and Meta's interceptions of the contents of their communications with Blue Shield's website. Blue Shield's Privacy Policy and HIPAA Notice did not provide sufficient notice that Plaintiffs' and Class members' sensitive health communications would be intercepted and used for marketing and other purposes, particularly given Blue Shield's express statement that such information would *not* be disclosed for these purposes without prior consent. HHS Guidance ("[T]he Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures.")

200. Further, Blue Shield's HIPAA Notice, among other things, informed visitors that Blue Shield "*will not use your PHI for marketing purposes* without your prior written authorization." HIPAA Notice (emphasis added).

201. Blue Shield did not seek permission from Plaintiffs and Class members regarding the use of Google Analytics or the Meta Pixel on Blue Shield's website, including on the log in webpage, the "Find a Doctor" webpage, the symptom tracker webpage, and webpages where Plaintiffs' and Class members' made confidential searches or inputs regarding their healthcare or treatment. Nor did

Blue Shield adequately notify Plaintiffs and Class members that their entries into these pages and Blue Shield's website generally were being intercepted and acquired by Google and Meta.

202. Blue Shield cannot state any viable exception to liability under the Wiretap Act.

203. Blue Shield does not qualify for the party exception under 18 U.S.C. § 2511(2)(c) because it was not acting under color of law when it installed Google Analytics and the Meta Pixel on its website to intercept the confidential, health-related communications of Plaintiffs' and Class members in violation of federal and state laws, including 42 U.S.C. § 1320d-6; 45 CFR § 164.508(a)(1); 15 U.S.C. § 45; Cal. Penal Code § 631, *et seq.*; Cal. Penal Code § 638.51(a); Cal. Civ. Code § 56, *et seq.*; and Cal. Bus. & Prof. Code § 17200, *et seq*.

204. Blue Shield does not qualify for the exception under 18 U.S.C. § 2511(2)(d). Google and Meta did not explicitly disclose or notify users that Plaintiffs' and Class members' confidential, health-related communications would be acquired for use in targeted advertising, marketing, or for other purposes. Blue Shield's Notice of Data Breach further stated that it was notifying Plaintiffs and Class members "of a potential data breach that may have included elements of their protected health information." *See* Notice of Data Breach.

205. Moreover, 18 U.S.C. § 2511(2)(d) does not immunize Blue Shield from liability because its interception of electronic communications was "for the purpose of committing [a] criminal or tortious act" under 18 U.S.C. § 2511(2)(d) in violation of state and federal laws, including 42 U.S.C. § 1320d-6; 45 CFR § 164.508(a)(1); 15 U.S.C. § 45; Cal. Penal Code § 631, *et seq.*; Cal. Penal Code § 638.51(a); Cal. Civ. Code § 56, *et seq.*; and Cal. Bus. & Prof. Code § 17200, *et seq*.

206. Specifically, Blue Shield is liable even if it consented to the interception of Plaintiffs' and Class members' confidential communications by Google and Meta, because the interception of Plaintiffs' and Class members' communications, including PHI, by Google and Meta, constitutes a criminal and tortious act. The interceptions violated HIPAA, which provides for criminal penalties, and invaded Plaintiffs' and Class members' reasonable expectation of privacy under common law and the California Constitution.

207. In particular, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person ... without authorization" from the patient. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

208. Blue Shield's conduct constituted a criminal and tortious act under 42 U.S.C. § 1320d-6 because it (a) used and caused to be used persistent identifiers associated with specific Plaintiffs and Class members without their authorization and (b) disclosed the contents of communications to Google and Meta without Plaintiffs' and Class members' authorization. Blue Shield's actions would also be subject to enhanced penalties under 42 U.S.C. § 1320d-6 because its use of Google Analytics and the Meta Pixel was for commercial advantage, including marketing, advertising, and increasing revenues from Plaintiffs and Class members, as well as soliciting new customers.

209. Blue Shield also committed a tortious invasion of Plaintiffs' and Class members' privacy by disclosing Plaintiffs' and Class members' PII and PHI to Google and Meta. As described above, Plaintiffs and Class members reasonably believed that their confidential communications regarding their healthcare and treatment would be kept private from unauthorized third parties like Google and Meta. The sensitive nature of the information intercepted by Google and Meta through the use of Google Analytics and the Meta Pixel made the intrusion highly offensive.

210. Blue Shield's conduct further violated the HIPAA Privacy Rule by providing its patient lists to Google and Meta—in exchange for the use of Google Analytics and the Meta Pixel—without obtaining Plaintiffs' and Class members' prior written authorization. Although Google Analytics and the Meta Pixel can be used for free, the implicit cost of these technologies was Plaintiffs' and Class members' identifying information and protected health data for use in targeted advertising. *See* Notice of Data Breach ("Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included

protected health information. Google may have used this data to conduct focused ad campaigns back to those individual members.").

211. The information Google and Meta intercepted from Plaintiffs and Class members has enormous market value, including to Google, Meta, and Blue Shield. Both Google and Meta use the information gathered from Plaintiffs and Class members to improve their analytics insights and advertising services for Blue Shield and other websites, and Blue Shield was able to use enrollees' PII and PHI for targeted advertising campaigns via Google Ads and on Facebook and Instagram.

212. Blue Shield also acted tortiously by using Google Analytics and the Meta Pixel without Plaintiffs' or Class members' consent so that it could obtain Google's and Meta's market research and consumer analysis technologies.

213. By allowing Google and Meta to intercept Plaintiffs' and Class members' health information while that information was being shared with Blue Shield, Blue Shield deprived Plaintiffs and Class members of the value of their personal health information.

214. Plaintiffs and Class members have suffered damages as a direct and proximate result of Blue Shield's violation of the Wiretap Act.

215. Pursuant to 18 U.S.C. § 2520(b)(1), Plaintiffs and Class members seek equitable and declaratory relief as appropriate.

216. Pursuant to 18 U.S.C. § 2520(c)(2), Plaintiffs and Class members seek the greater of (a) the sum of actual damages suffered per plaintiff and any profits made by Blue Shield as a result of each violation of the Wiretap Act or (b) statutory damages of the greater of $100 per plaintiff, per day for each day of violation or $10,000.

217. Pursuant to 18 U.S.C. § 2520(b)(2), Plaintiffs and Class members seek punitive damages.

218. Pursuant to 18 U.S.C. § 2520(b)(3), Plaintiffs and Class members seek reasonable attorneys' fees and litigation costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court enter an order:

A. Certifying the Class;

B. Finding that Defendant's conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Defendant;

D. Awarding injunctive and any other equitable relief the Court deems appropriate;

E. Awarding Plaintiffs and Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and disgorgement of profits unlawfully obtained;

F. Awarding Plaintiffs and Class members pre- and post-judgment interest;

G. Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury of all issues so triable of right.

DATED: September 29, 2025

Respectfully submitted,

By: */s/ Adam Polk*

Adam Polk (SBN 273000)
Trevor Tan (SBN 281045)
Fatima Ladha (SBN 353675)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: apolk@girardsharp.com
Email: ttan@girardsharp.com
Email: fladha@girardsharp.com

By: _/s/ Amber L. Schubert_
Robert C. Schubert (No. 62684)
Amber L. Schubert (No. 278696)
Daniel L.M. Pulgram (No. 354569)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
Email: rschubert@sjk.law
Email: aschubert@sjk.law
Email: dpulgram@sjk.law

*Interim Co-Lead Class Counsel*