Adam Polk (No. 273000)
Abbye R. K. Ognibene (No. 311112)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
Email: apolk@girardsharp.com
Email: abbyeo@girardsharp.com

Robert C. Schubert (No. 62684)
Amber L. Schubert (No. 278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
Email: rschubert@sjk.law
Email: aschubert@sjk.law

*Interim Co-Lead Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

*In re Blue Shield of California Data Privacy Litigation*

This Document Relates To:

All Actions

Case No. 4:25-cv-03209-YGR

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**REDACTED**

Class Plaintiffs Rachel Markovitz, Austin Kahn, and Susan Reiman file this amended consolidated class action complaint individually and on behalf of all similarly situated individuals against Defendant California Physicians' Service d/b/a Blue Shield of California ("Blue Shield") and allege as follows:

## INTRODUCTION

1. Few things are more closely guarded than the details of one's medical conditions and medical care. Numerous federal and state laws require hospitals, doctors, and their business associates to keep patients' information in the strictest confidence. Because this data is so sensitive, the penalties for wrongfully disclosing or mismanaging it are severe—in some cases even criminal.

2. Blue Shield of California ("Blue Shield") is a major health plan organization with approximately 6 million members. This class action involves Blue Shield's unlawful disclosure of its enrollees'[1] sensitive personal and medical information to third parties for use in advertising in violation of federal law.

3. Blue Shield obtained enrollees' sensitive and protected medical information by installing and actively managing several online tracking tools on its website, including Google Analytics and the Meta Pixel. Blue Shield configured these tracking technologies to automatically intercept Plaintiffs' and Class members' personally identifying information ("PII") and protected health information ("PHI") and disclose them to Google, LLC ("Google") and Meta Platforms, Inc. ("Meta") without enrollees' knowledge or consent. Google, Meta, and Blue Shield then used this data to serve highly targeted advertisements on various platforms, among other commercial uses.

4. Blue Shield's configuration and use of Google Analytics and the Meta Pixel on its website redirected massive amounts of enrollees' protected and strictly confidential communications, PII, and PHI from the Blue Shield website to Google and Meta—including medical information protected by the Health Information Portability and Accountability Act ("HIPAA"). Blue Shield was

[1] While the allegations herein largely apply to all Blue Shield website visitors, the class is defined, *infra*, to include only Blue Shield enrollees. As used herein, "enrollees" refers to persons enrolled in a Blue Shield plan at any time between 2012 and 2025 or the period during which Google Analytics and/or the Meta Pixel were installed on Blue Shield's website.

in control of what data was intercepted and disclosed. It dictated which communications to track and redirect to major tech platforms, what Google Analytics and Meta Pixel functions to use on each page of its website, and what protected data it would use to serve highly targeted ads for its own financial gain.

5. Meanwhile, Meta and Google each received and used troves of enrollees' personally identifying medical information for their own commercial purposes, including to provide advertising and other paid services to Blue Shield and other advertising customers.

6. All the while, Plaintiffs and Class Members had no notice that the sensitive medical information communicated to Blue Shield via its website was being scraped and sold for profit.

7. Specifically, Blue Shield set up Google Analytics and the Meta Pixel to track how website visitors, including enrollees, interacted and communicated with the website. It programmed these technologies to track when enrollees used the site to search for doctors, find clinical locations, submit forms to check eligibility for services or offerings, review claims or other medical data, search for information on various treatments, or log-in to Blue Shield's enrollee portal. These communications were then intercepted in transit and automatically and contemporaneously redirected and disclosed to Google and Meta. The data was then used by Google and Meta to power and sell their advertising services. Meanwhile, Blue Shield received analytics about its website, including detailed insights on each individual's activities on the site. Blue Shield then used that data, and the tools Google and Meta provided, to optimize its marketing efforts by deploying personalized and targeted advertisements, among other uses.

8. Blue Shield's use of Google Analytics and the Meta Pixel on its website violated its obligation under HIPAA to safeguard PHI. Under HIPAA and associated regulations, covered entities, including Blue Shield, are required to protect health information linked to specific individuals from disclosure to unauthorized third parties.[2] HIPAA also prohibits the use of this sensitive data for marketing—the exact use Blue Shield collected it for—absent consent.[3]

[2] *See* 42 U.S.C. §§ 1320d, *et seq.*; 45 C.F.R. §§ 160.101, *et seq.*

[3] *See* 45 CFR § 164.508(a)(3); 45 CFR § 164.501 (definition of "Marketing").

9. Blue Shield never obtained consent for tracking, intercepting, disclosing, or using sensitive health data on its website.

10. Blue Shield's conduct violated federal law. The Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the unauthorized interception of the contents of any electronic communication.[4] It provides a private right of action to anyone whose intercepted electronic communications were disclosed or used in violation of the Act.

11. Blue Shield intentionally used these tracking technologies to redirect the contents of Plaintiffs' and Class members' highly sensitive, health-related electronic communications and disclose them to Meta and Google for use in advertising without consent. Blue Shield configured Meta's and Google's tracking tools to capture the details of Plaintiffs' and Class members' past, present, and future physical health and healthcare—even the treatments they were seeking and the names of their healthcare providers—so that Blue Shield could use that data for its own profit.

12. This was a collateral, secret use of information that enrollees provided to obtain healthcare. Because this undisclosed data collection went beyond the "use case" for which the enrollees provided the data, a reasonable Blue Shield enrollee could not expect that their insurer would disclose it for its own financial benefit. Indeed, Blue Shield did not expressly or clearly disclose these practices or offer enrollees the choice of opting out. Thus, no reasonable person could have consented to such invasive tracking, and Plaintiffs and Class Members did not consent here.

13. Blue Shield invaded Plaintiffs' and Class members' privacy by disclosing and using their health information in violation of the law and social norms. This information is personal, sensitive, and protected by federal (and California) law. Plaintiffs' and Class members' reasonable expectation of privacy was bolstered by Blue Shield's own policies, which pledged not to disclose or use Plaintiffs' and Class members' health information without their express consent.

14. Blue Shield's decision to share this information with the world's largest tech companies and online advertisers violated its enrollees' fundamental privacy rights.

[4] 18 U.S.C. § 2511.

15. Blue Shield is liable to Plaintiffs and those similarly situated under the Wiretap Act for the intentional disclosure and use of the contents of their unlawfully intercepted confidential healthcare communications without consent.

16. Plaintiffs bring this action and seek all civil remedies, including compensatory, statutory, and punitive damages, injunctive relief, and attorneys' fees and costs.

## PARTIES

17. Plaintiff AUSTIN KAHN is a resident of Los Angeles County and a citizen of California. His protected information and communications were intercepted on the Blue Shield website and disclosed to Google and Meta for commercial use (including for marketing), without Plaintiff Kahn's knowledge or consent, as a direct result of Blue Shield's installation and configuration of Google Analytics.

18. Plaintiff RACHEL MARKOVITZ is a resident of Riverside County and a citizen of California. Her protected information and communications were intercepted on the Blue Shield website and disclosed to Google and Meta for commercial use (including for marketing), without Plaintiff Markovitz's knowledge or consent, as a direct result of Blue Shield's installation and configuration of Google Analytics and the Meta Pixel.

19. Plaintiff SUSAN REIMAN is a resident of Orange County and a citizen of California. Her protected information and communications were intercepted on the Blue Shield website and disclosed to Google and Meta for commercial use (including for marketing), without Plaintiff Reiman's knowledge or consent, as a direct result of Blue Shield's installation of Google Analytics and the Meta Pixel.

20. Defendant CALIFORNIA PHYSICIANS' SERVICE d/b/a BLUE SHIELD OF CALIFORNIA ("Blue Shield") is a corporation headquartered at 601 12th Street in Oakland, California 94607.

21. Blue Shield is an independent member of the Blue Cross Blue Shield Association—a federation of independent and locally operated Blue Shield companies across the United States. Blue

Shield and its affiliates provide health, dental, vision, Medicare and Medicaid health care service plans to California consumers.

22. Blue Shield is a major health plan organization with around 6 million members, over 6,500 employees and more than $27 billion in annual revenue.

23. In 2025, Blue Shield restructured its affiliations. Blue Shield is now overseen by a new corporate entity called Ascendiun. Ascendiun oversees Blue Shield; Blue Shield of California Promise Health Plan, a managed care organization wholly owned by Blue Shield and offering Medi-Cal plans; Stellarus, a healthcare business focused on pharmacy care and technology; and Altais, a healthcare company. Ascendiun is Blue Shield's ultimate parent and the primary Blue Cross Blue Shield Association licensee.

## JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, specifically the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are more than 100 proposed Class members, some members of the proposed class and the defendant are citizens of different states, and the amount in controversy exceeds $5 million.

25. This Court has general personal jurisdiction over Blue Shield because it is a California corporation and maintains its principal place of business in this state.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Blue Shield resides in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

27. Pursuant to Civil Local Rule 3-2(c) and 3-5(b), assignment to the Oakland Division of the Northern District of California is proper because a substantial part of the events or omissions which gave rise to the claims occurred in Alameda County—where Blue Shield is headquartered—which is located in this division.

**BACKGROUND**

**I. Web Tracking Technologies**

28. Google and Meta, two of the largest players in the tech industry, offer website owners like Blue Shield web tracking tools to analyze data collected from their websites and use it for commercial purposes, including for highly targeted advertising.

29. Google describes its widely used tracking technology, Google Analytics, as "a platform that collects data from your websites and apps to create reports that provide insights into your business."[5] Likewise, as Meta explains, "the Meta Pixel works by sharing data about user actions on your website — such as page views, add to cart, purchases and other standard events — and sends this information to Meta to improve ad delivery and measurement."[6]

**A. How Data is Collected**

30. Web tracking tools are installed and configured by website owners like Blue Shield (or their agents), who dictate what data is sent from their websites to Google and Meta by how they write the code for their own websites.

31. Website owners can redirect data from their site by adding pieces of third-party (e.g., Google or Meta) code into their website's source code. The website's source code, when it executes in user's web browser, will then track specific actions a user takes and disclose that data to the third-party whose code is implemented.

32. For example, to install Google Analytics, the website owner needs to "add a small piece of JavaScript measurement code to each page on your site."[7] Likewise, Meta describes its Meta Pixel as "a snippet of JavaScript code that loads a small library of functions you can use to track Facebook ad-driven visitor activity on your website."[8]

---

[5] Google, "How Google Analytics Works," *available at* https://support.google.com/analytics/answer/12159447 (last accessed July 30, 2026).

[6] Meta, "Meta Pixel," *available at* https://www.facebook.com/business/tools/meta-pixel/ (last accessed July 30, 2026).

[7] Google, "How Google Analytics Works," *supra* note 5.

[8] Meta, "Meta Pixel: Get Started," June 30, 2026, *available at* https://developers.facebook.com/docs/meta-pixel/get-started (last accessed July 30, 2026).

33. Once added to the website's source code, the Google or Meta code (as configured by the website owner) dictates what data is sent and to where.

34. When a person seeks to view a website, their web browser (e.g., Safari or Chrome) sends a series of requests to the website's servers using the standard Hypertext Transfer Protocol (HTTP) protocol and the website's servers respond to those requests. The HTTP requests contain, *inter alia*, the user's IP address (an identifier assigned to the user's device accessing the site) and the URL (the address the web browser is requesting). HTTP requests and responses can also include headers, which contain additional information—including all cookies that were stored in the web browser.

35. Tracking technologies, including those offered by Google and Meta, collect two types of data from HTTP requests: (1) identifiers, and (2) browsing activity.

36. One way to collect identifiers is through cookies. Cookies are small pieces of text used to receive and store information on web browsers. The identifiers stored in cookies can include both account identifiers (which uniquely identify the user visiting the website) and device identifiers (which uniquely identify the user's device). An account identifier is akin to a person's driver's license number, while a device identifier is akin to the vehicle's license plate number.

37. There are two kinds of cookies: "first-party" cookies and "third-party" cookies.

38. First-party cookies are owned by the website being visited, such as Blue Shield's cookies for a user browsing the Blue Shield website. These cookies allow same-site tracking of a user on a particular website.

39. Third-party cookies are owned by a website *other than* the one visited, such as Meta's cookies installed on Blue Shield's website.[9] Third-party cookies allow cross-site tracking of a user across different websites.

40. Third parties like Google and Meta can disguise their third-party cookies as ghostwritten first-party cookies, allowing them to track users even if the user has configured their

---

[9] *Id.*

web browser to block third-party cookies. Google and Facebook are the most pervasive cookie ghostwriters.

41. While third-party tracking technologies automatically collect certain core data from every page on which they are embedded, Google and Meta give website owners the ability to customize what additional data (and from which pages of its site) is tracked and redirected to Google or Meta, where it is viewed and processed.

42. For example, a website owner can configure Google Analytics or the Meta Pixel to track whether a visitor clicks on a specific button, how much of a video they watch, or whether they log in to an account on the site. The website owner implements this tracking by adding custom instructions into the third-party code they embed on each page of their website.

43. Below is an example of how Blue Shield configured Google Analytics [redacted][10]

[redacted]

44. Website owners can also configure trackers to share information about the user—such as unique identifiers assigned to them (e.g., member ID), their biographic information (e.g., age, gender, zip code, and family size) or—as relevant here—details about their insurance plane (e.g., plan name and type).

[10] BSC0665641.

45. As illustrated below, [redacted].[11]

[redacted]

46. Once a website owner installs and configures tracking technology on its site, the data is contemporaneously intercepted. It is redirected to Google and/or Meta, where it is automatically viewed, processed, and analyzed by the tech companies' algorithms so that it can be used by the website owner, Google, and Meta for myriad purposes. It is then stored on Google's or Meta's databases.

**B. How Intercepted Data Is Used**

47. Website owners like Blue Shield can use Google's and Meta's services to analyze data intercepted on their webpages by sorting it and running reports. For example, they can see how many people viewed a page over time or engaged in a specific action.

48. Google advertises that website owners can use its tracking tools to "[g]et a complete understanding of your customers across devices and platforms" in order to "understand the customer journey and improve marketing [return on investment]."[12] Meta encourages website owners to "[m]easure the actions and outcomes that matter most to your business, helping you optimize campaigns for real impact."[13]

---

[11] *Id.*
[12] Google, "Analytics," *available at* https://marketingplatform.google.com/about/analytics/ (last accessed July 30, 2026).
[13] Meta, "Meta Pixel," *available at* https://www.facebook.com/business/tools/meta-pixel (last accessed July 30, 2026).

49. For example, Blue Shield used Google Analytics [redacted][14]

[redacted]

50. Website owners can also track users' journeys through the website. For example, Blue Shield used Google Analytics [redacted][15]

[redacted]

[14] BSC0672138.
[15] BSC0006264.

51. Website owners can also use their troves of website visitor data to serve ads. They can link Google Analytics to Google Ads, Google's ad serving platform, to use the same data in Google Analytics to serve ads. Likewise, the data obtained through deployment of the Meta Pixel can be used to serve ads directly in the social networking platforms owned by Meta (Instagram and Facebook).

52. Website owners, like Blue Shield, control the content and deployment of ads. They decide what ads to serve, who to serve the ads to, what platform to serve them on, and what web page visitors will land on if they click the ad.

53. One of the most valuable functions of online tracking data is its use in targeted advertising.

54. Targeted ads are tailored or personalized to a specific audience based on the behaviors of members of the audience (e.g., their actions on the Blue Shield's website or on Facebook or Google) or their demographics and interests.

55. As Google explains to website owners, "You can show your ads to specific audience segments based on who they are, their interests and habits, what they're actively researching, or how they've interacted with your business."[16] Targeting visitors based on their known prior actions is called "retargeting." Google and Meta also allow creation of "custom audiences" that can be used for targeting. Google described its various available custom audiences as follows:[17]

- **Affinity segments**: Reach users based on what they're passionate about and their habits and interests.
- **Custom segments**: Custom segments help you reach your ideal audience by entering relevant keywords, URLS and apps.
- **Detailed demographics**: Reach users based on long-term life facts.
- **Life events**: Reach users when they're in the midst of important life milestones.
- **In-market**: Reach users based on their recent purchase intent.
- **Your data segments**: Reach users that have interacted with your business.
    - **Website and app visitors**: Reach people who have visited either your website or your apps.

[16] Google, "Add audience targeting to an ad group or campaign," *available at* https://support.google.com/google-ads/answer/2497940?sjid=5556623194670537611-NA (last accessed July 30, 2026).

[17] Google, "About Audience Segments," *available at* https://support.google.com/google-ads/answer/2497941?sjid=5556623194670537611-NA (last accessed July 31, 2026).

- **Customer Match**: Reach your existing customers based on your CRM data.
- **Lookalike segments**: Reach groups of people that share characteristics with others on an existing "seed" list. Lookalike segments are only available in Demand Gen campaigns.

- **Google-engaged audiences**: Reach users who have previously interacted with your website on Google Search, YouTube, or other Google sites.

56. Website owners use these custom audiences to target the people they want to see their ads. For example, Blue Shield might tailor its ads for health insurance to a custom audience of Californians approaching age 26 or its ads for Medicare to a custom audience of Facebook users between the ages of 60 and 65 who already viewed Blue Shield's Medi-Cal webpage.

57. For example, Blue Shield [redacted] as shown below:[18]

[redacted]

[18] BSC0002651.

58. Blue Shield also [redacted]:[19]

[redacted]

59. The data that fuels this targeting (e.g., location, age, or browsing behavior) is collected through Blue Shield's configuration of Meta and Google tracking technologies on its website. That data can also be combined with other data website owners have disclosed to Meta and Google concerning each user. All of this data is linked together using data about the user or the user's device(s).

[19] BSC0002658.

60. As Meta explains, the cookies placed by the Meta Pixel enable Meta to "match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[20]

61. The more data that an advertiser can collect from its target customers, the more effective its advertising. As Blue Shield explained in a 2022 internal presentation on its [redacted]:[21]

[redacted]

[20] Meta, "Meta Pixel: Get Started," June 30, 2026, *available at* https://developers.facebook.com/documentation/meta-pixel/get-started (last accessed July 30, 2026).

[21] BSC0650141.

62. Advertisers use targeted audiences fueled by personal data to optimize their advertising campaigns and make them more effective.

63. [redacted][24]

[redacted]

64. While Google's or Meta's technology actually displays ads on web pages or sites like Google, YouTube, Instagram, and Facebook, the ads are designed and deployed by website owners like Blue Shield who select which ads to serve and to which audiences.

65. Any data about how visitors engage with the website after clicking the ad is fed back into Google's or Meta's advertising system to continuously increase and enhance the data available to website owners, like Blue Shield, for commercial purposes.

## II. Regulatory Background

66. HIPAA regulations prohibit covered entities, including health insurance providers and networks of health care provides, from disclosing information related to an individual's "past, present, or future physical or mental health or condition [. . .]; the provision of healthcare to [the] individual;

---

[22] CPL reflects the cost to Blue Shield to identify a person who might be a good "lead" or candidate to sell a product to.

[23] CPA reflects the cost to Blue Shield to convert someone into a customer.

[24] BSC0650823.

or the past, present, or future payment for the provision of health care to [the] individual" when paired with specific kinds of identifying information.[25] Such information, when tied to identifying data, is "individually identifiable health information" and, when stored or transmitted electronically or otherwise, is "protected health information" under HIPAA.[26]

67. As relevant here, covered entities like Blue Shield are prohibited from disclosing any such information in conjunction with a "geographic subdivision smaller than a State," a "[d]evice identifier" or "serial number," a "[w]eb Universal Resource Locator[]," an "[i]nternet [p]rotocol (IP) address number," or "[a]ny other unique identifying number, characteristic, or code"—i.e., the identifiers Blue Shield configured Google Analytics and Meta Pixel to collect and disclose to Google and Meta.[27] As the U.S. Department of Health and Human Services ("HHS") explains in its HIPAA guidance, "if such [identifying information] [is] listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[28]

68. HIPAA also expressly prohibits disclosures of PHI for marketing purposes absent HIPAA-compliant authorization.[29] A valid authorization must, *inter alia*, contain a "a description of the information to be used or disclosed that identifies the information in a specific and meaningful fashion;" the "name or other specific identification of the person(s), or class of persons, to whom the covered entity may make the requested use or disclosure," and the "[s]ignature of the individual and date."[30] It must also inform the person from whom it seeks authorization that such authorization can be revoked and that authorization will not be a condition for "treatment, payment, enrollment or eligibility for benefits," as well as detail the risks of further disclosure.[31]

---

[25] 45 C.F.R. § 160.103.
[26] *Id.*; 45 C.F.R. §164.514.
[27] 45 C.F.R. § 164.514.
[28] U.S. Dep't of Health & Hum. Servs., "Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule," as of Sept. 11, 2024, *available at* https://perma.cc/BX66-6A6R.
[29] 45 C.F.R. § 164.508(a)(3).
[30] 45 C.F.R. § 164.508(c)(1).
[31] 45 C.F.R. § 164.508(c)(2).

69. The Office for Civil Rights ("OCR") at HHS, which is tasked with administering and enforcing HIPAA, has issued guidance on the intersection of HIPAA and online tracking technologies. The Department instructs that covered entities "*are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules*. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[32]

70. OCR was clear in this guidance that it has "always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors" and it was providing the guidance as a "reminder that it is critical for regulated entities to ensure that they disclose PHI *only* as expressly permitted or required by the HIPAA Privacy Rule."[33]

## FACTUAL ALLEGATIONS

### I. Enrollees on Blue Shield's website reasonably expect their information to stay private.

71. Like most insurance providers, Blue Shield has a website. On that site, it provides information about its plans, allows users to search for doctors, and provides myriad health and health insurance related resources

72. Blue Shield's website also allows its enrollees to create and log in to an account using their member ID or Social Security number. After logging in, enrollees can manage many aspects of their healthcare, including to "[f]ind a doctor, access paperless claims, or schedule virtual care."[34] Blue Shield enrollees can also use the website to search for specialists and services, explore healthcare plans (including by submitting forms concerning their personal medical details), and find information about their healthcare conditions. Enrollees routinely input their private, confidential medical

---

[32] U.S. Dep't of Health & Hum. Servs., Off. for Civ. Rts., "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates," current as of June 26, 2024, *available at* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis in original).

[33] *Id.* (emphasis in original).

[34] Blue Shield, "Create New Account," archived Mar. 6, 2023, *available at* bit.ly/3N8gLY1. This account is password-protected and can only be accessed by Blue Shield enrollees.

information, including information related to specific health conditions and treatments, into the site to access information and services.

73. Enrollees using Blue Shield's website have a reasonable expectation that Blue Shield will keep their health information private. Indeed, in signing up for Blue Shield, they execute a HIPAA disclosure which emphasizes the confidential nature of the medical information they share.

74. In reliance on these promises, enrollees then disclose highly sensitive details about their health conditions, concerns, illnesses, treatments, physician selections, doctor-patient communications, claims, and geolocations to Blue Shield through its website for the purpose of obtaining care.

75. Given the sensitive nature of the information enrollees share on the website and the promises that Blue Shield makes about taking care to protect their information, an objectively reasonable Blue Shield enrollee would understand that their sensitive medical information would not be intercepted, disclosed to those third-parties, or used for advertising purposes.

76. Enrollees' reasonable expectation of privacy is even stronger because Blue Shield is legally obligated by HHS's "Privacy Rule" to safeguard PHI under HIPAA.[35] The Privacy Rule protects information that (1) is "created or received by a health care provider [or] health plan"; (2) relates to "the past, present, or future physical or mental health or condition of an individual"; "the provision of health care to an individual"; or "the past, present, or future payment for the provision of health care to an individual"; and (3) that either "identifies the individual" or reasonably "can be used to identify the individual."[36]

77. When a Blue Shield enrollee logs into Blue Shield's website and discloses PHI and PII (for example, by using search terms to find a particular physician or treatment), HIPAA prohibits Blue Shield from disclosing those communications to undisclosed third parties like Google and Meta or using them for targeted advertising absent valid authorization.

[35] 45 C.F.R. § 160.103; 42 U.S.C. §§ 1302, *et seq.*
[36] 45 C.F.R. § 160.103.

## II. Blue Shield disclosed enrollees' intercepted health data to Google and Meta for commercial use without consent.

78. Blue Shield concedes that it must protect Plaintiffs' and Class members' PHI. It acknowledges its obligations on its website and promises to follow HIPAA and California law.

79. In its "Notice of Privacy Practices" ("HIPAA Notice"), Blue Shield assures enrollees that it is "required to maintain the privacy of your PHI and to notify you in the event that you are affected by a breach of unsecured PHI."[37]

80. Blue Shield adds that "[w]hen we use or give out ('disclose') your PHI, *we are bound by the terms of this Notice*, which applies to *all* records that we create, obtain, and/or maintain that contain your PHI."[38]

81. While Blue Shield provides a limited list of reasons it might disclose an enrollee's PHI related to treatment, payment, and healthcare operations, Blue Shield does not inform enrollees about its disclosure to third-parties Google and Meta for marketing. To the contrary, Blue Shield specifically promises that it "*will not use your PHI for marketing purposes without your prior written authorization*."[39]

82. Likewise, Blue Shield's Online and Mobile Privacy Notice ("Privacy Policy") states that "[a]ny personal information you provide on our website or App will be used only in ways consistent with this [Privacy Policy], the HIPAA [Notice] . . . and in accordance with applicable laws and regulations."[40]

83. Blue Shield didn't honor its promises. Unbeknownst to enrollees, Google and Meta products on the website were secretly intercepting their communications—including PII and PHI—in real time using covert tracking tools and disclosing them to Google and Meta. Google, Meta, and Blue Shield then used this information to serve targeted advertising, among other commercial uses.

---

[37] Blue Shield, "Notice of Privacy Practices," archived Jan. 30, 2024, *available at* https://perma.cc/A8BF-YYAY.

[38] *Id.* (emphasis added).

[39] *Id.* (emphasis added).

[40] Blue Shield, "Online and Mobile Privacy Notice," archived Jan. 31, 2024, *available at* https://perma.cc/5N85-5SP6.

**A. Blue Shield's 2025 Notice of Data Breach**

84. On April 9, 2025, Blue Shield issued a "Notice of Data Breach" to insurance plan participants, including enrollees, disclosing for the first time that it was allowing enrollees' medical information to be shared with Google through Google Analytics.

85. The disclosure stated, as relevant here:

> Blue Shield of California has begun notifying certain members of a potential data breach that may have included elements of their protected health information.
>
> ***
>
> **What happened**
>
> Like other health plans, Blue Shield historically used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites. We were doing this to improve the services we provide to our members.
>
> On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns back to those individual members. We want to reassure our members that no bad actor was involved, and, to our knowledge, Google has not used the information for any purpose other than these ads or shared the protected information with anyone.
>
> Blue Shield severed the connection between Google Analytics and Google Ads on its websites in January 2024. We have no reason to believe that any member data has been shared from Blue Shield's websites with Google after the connection was severed. Upon discovering the issue, Blue Shield immediately initiated a review of its websites and security protocols to ensure that no other analytics tracking software is impermissibly sharing members' protected health information.
>
> **What information was involved**
>
> The information that may have been impacted includes the following: Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for members' online accounts; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

86. Blue Shield 's Notice of Data Breach contained the following admissions regarding its use of Google Analytics:

a) Blue Shield *voluntarily* disclosed information to Google for several years and had itself installed and configured the Google tracking technology at issue. While Blue Shield characterized the incident as a "data breach," it did not identify a hacker or other bad actor who obtained access to its website without Blue Shield's consent.

b) The information Blue Shield disclosed "likely included" several categories of sensitive PHI, such as: "medical claim service date and service provider, patient name, and patient financial responsibility; and 'Find a Doctor' search criteria and results (location, plan name and type, provider name and type)."

c) BlueShield used Google's technology to leverage this data for targeted ad campaigns.

d) Blue Shield decided to "sever[] the connection between Google Analytics and Google Ads on its websites in January 2024." Despite this admission, Blue Shield claims it did not discover its disclosure of PHI to Google until February 2025. It did not send notifications to affected persons until April 2025.

87. Blue Shield's actions violated its obligations to keep enrollees' personal health information confidential and not disclose it to unconsented-to third parties and, particularly, to avoid doing so using online tracking technologies.

88. Although Blue Shield has characterized the disclosures as a "breach," the data was transmitted using code Blue Shield deliberately installed, configured, and managed on its website.

89. Blue Shield's notice tacitly admits that Blue Shield had not previously disclosed these transmissions to its customers or obtained valid consent.

**B. Blue Shield's website transmitted PII and PHI to Google.**

90. Blue Shield's website transmitted enrollees' PII and PHI to Google beginning no later than 2012.

**1. How Google Analytics Works.**

91. One mechanism Blue Shield used to disclose enrollees' PII and PHI was Google Analytics, which Blue Shield embedded into its website alongside Google Ads.

92. As described above, Google Analytics is a powerful tool that, when activated by a website owner, enables the site owner to uniquely identify, track, and transmit site users' activities. Sharing users' personal information with Google Analytics unlocks a host of powerful insights that website owners use to track their site users, sell more services, and increase revenue.

93. Installing Google Analytics alongside Google Ads also enabled Blue Shield to conduct granular analyses of the information it wanted tracked and to purchase targeted, personalized advertising from Google.

94. Google Analytics tools allowed Blue Shield to intercept users' communications with its website in transit on a continual basis as the communications occur. By design, Blue Shield configured Google Analytics to intercept and record users' activities on its website by attaching a particular string of code to individual pages on its website.

95. For example, when a user searches for a specific term on the website's "Find a Doctor" search bar, Blue Shield configured Google Analytics to attach a string of code to the resulting web address, causing the user's search terms to be sent not only to the website, but also to Google.

96. Importantly, Google Analytics' tracking services are designed to be invisible to website visitors and can be detected only by delving into the website's underlying source code. The website user remains unaware of the presence of Google Analytics and Google Ads and has no way of preventing its activities.

**2. Blue Shield used Google to track and identify individual enrollees.**

97. Blue Shield used Google Analytics to collect PII and PHI from Blue Shield's website.

98. As Google's Privacy Policy explained, "[t]he information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number."[41]

99. Google Analytics also assigned unique tracking cookies to individual users on Blue Shield's website, which allowed their communications and activity to be individually distinguished.

100. Taken together, Blue Shield configured Google Analytics' tracking features to pull and collect specific data for each individual enrollee using Blue Shield's website in real time while they used the website. That enabled Blue Shield, and, by extension, Google, to "pull event information for any given user" and "analyze and export event level data for a single user."[42]

101. Blue Shield was on notice about the risks posed to its enrollees' privacy by Google Analytics. Blue Shield affirmatively agreed to Google Analytics' Terms of Service, which stated that Google "may retain and use . . . information collected" from Blue Shield's enrollees on its website.[43] Likewise, Blue Shield agreed to abide by Google's policies, which expressly provide that Google "use[s] [site visitors'] information to deliver our services."[44]

102. Google recognizes the privacy risks inherent in a service that collects so much information on individual users. To mitigate the risk that sensitive or personal information is shared with Google through its software, Google urges its customers—including Blue Shield—to take steps to prevent protected data from being collected through its software. But ultimately it is Blue Shield that makes the decision on what data is captured and how by configuring Google's tracking technology on its website.

---

[41] Google, "Privacy Policy," Feb. 4, 2021, *available at* https://policies.google.com/privacy/archive/20210204?hl=en-US (last accessed July 30, 2026).

[42] Google, "Privacy Controls in Google Analytics," *available at* https://support.google.com/analytics/answer/9019185#zippy=%2Cin-this-article (last accessed July 30, 2026).

[43] Google, "Google Analytics Terms of Service," archived May 18, 2021, *available at* bit.ly/3XwECVO.

[44] Google, "Privacy Policy," archived May 18, 2021, *available at* https://bit.ly/4esTNGm.

103. For example, Google provides Analytics users, including Blue Shield, an opt-in feature that automatically anonymizes users' IP addresses. Google designed this feature to help site owners comply with privacy policies and governing law. When activated by website owners, the anonymization feature automatically adds a parameter to communications between the website user's computer and Google's server, which appears on the website's back-end code as the "aip" parameter:




104. Blue Shield chose not to activate Google's IP anonymization feature on its website. At all relevant times, Blue Shield omitted the all-important "aip" parameter, indicating that IP anonymization was not enabled. As a result, Google received enrollees' IP addresses and data reflecting their health-related online activity.

105. Google also warns HIPAA-covered customers like Blue Shield that they "must not use Google Analytics in a way that implicates Google's access to, or collection of, PHI" and that both "[a]uthenticated pages" and "[u]nauthenticated pages that are related to the provision of health care services" are "likely to be HIPAA-covered" and that "customers *should not set Google Analytics tags*" on those pages.[45]

106. Despite these regulations and Google's warnings, Blue Shield nevertheless configured Google's tracking technology to collect medical information with identifying information, facilitating Google's interception of the search terms and selections enrollees made on its website when they

[45] Google, "HIPAA and Google Analytics," archived Nov. 10, 2023, *available at* bit.ly/4gv7SoS (emphasis added).

accessed medical care (among other protected data). These search terms included, among other things, the specific medical conditions enrollees were experiencing, the specialty providers and treatments they needed, their physician preferences, their claims details, and location information—*i.e.*, information related to enrollees' past, present, or future physical or mental health and healthcare. This is one of many reasons why characterizing this sharing as a "breach" is a misnomer.

107. Despite Google's express warning, Blue Shield installed Google Analytics on the log-in page for Blue Shield enrollees within Blue Shield's website and continued to track enrollees after they logged in—*i.e.*, on authenticated pages. Accordingly, once an enrollee logged into Blue Shield's website, Blue Shield programmed the cite to send Google any contemporaneously intercepted communications and identifiers with that user's status as a Blue Shield enrollee—all for use in advertising.

108. Blue Shield also affirmatively turned on a feature called "Google Signals" when it configured Google Analytics on its site. With Google Signals enabled, Blue Shield could use Google's technology and data to link the information collected from visitors while they browsed Blue Shield's website to their Google Accounts (*e.g.*, G-mail accounts). This tracking allowed Blue Shield to tie enrollees' browsing activity to specific individuals.[46]

---

[46] Google, "[UA] Activate Google signals [Legacy]," archived Sept. 28, 2025, *available at* https://perma.cc/E86S-BPAQ.

109. One of the key features of Blue Shield's website is its "Find a Doctor" page, which allows enrollees to find healthcare services by selecting categories like "alternative medicine," "pharmacies," and "mental health," as shown below:




110. Enrollees can use the "Find a Doctor" tool to filter doctors by location, specialty, name, or medical group or search for specific doctors.

111. Blue Shield configured Google Analytics to track enrollees' text inputs and selections on the "Find a Doctor" page—even when they were not logged into their member accounts. As a result, the moment enrollees ran a search for a doctor, their personal information and search inputs were automatically disclosed to Google. Likewise, when an enrollee used filters or selected a particular physician, those details were also automatically intercepted and concurrently transmitted and disclosed to Google.

112. For example, as shown below, Blue Shield's website tracked and disclosed to Google the following information when a search was run: (1) that the user searched for providers with a specialty in **cardiology**, and (2) that the enrollee selected a doctor named **Phillip Levine**.













113. Similarly, Blue Shield configured Google Analytics to track and disclose to Google how enrollees were interacting with filters and other buttons within the "Find a Doctor" tool.

114. The example below shows that when a search was run in "Find a Doctor," Google collected the following information: (1) the user searched for **mental health** and **child psychiatry**, (2) the user selected the health plan **bronze tandem PPO**, (3) the user was a **subscriber** and **insured**, and (4) the user searched for providers in the **90210 zip code**.




115. Blue Shield also formatted its web tracking to capture any search terms entered by enrollees into Blue Shield's site-wide search bar and disclose them to Google.

116. For example, as shown below, when an enrollee types "Cardiology" into the search bar, that information is concurrently intercepted (as directed by Blue Shield's configuration of Google Analytics), along with that user's User-Agent[47] information and device information—all of which is then disclosed to Google.




117. ECPA, HIPAA, and Blue Shield's own policies required Blue Shield to obtain visitors' express consent before sharing the contents of their health communications with third parties such as Google. Blue Shield never obtained that consent.

118. Blue Shield enrollees had no notice that Blue Shield's website was tracking their communications and capturing their sensitive and protected health information with Google. Blue Shield does not require users to read or agree to its HIPAA Notice or other privacy policies before using its website.

119. Even if it did, the various privacy notices on Blue Shield's website were vague as to the specific kinds of information collected. While Blue Shield's Privacy Policy referenced its use of "tracking technologies" on its site, the policy stated that these technologies are used only to "gather demographic information about our user base *as a whole*," or, even more vaguely, to "collect

[47] User-Agent is a string contained in the HTTP header that provides information about a user's browser and operating system to the server. Combined, the IP address and User-Agent information enables servers to uniquely identify a user, even if cookies are blocked.

information" or "infer interests."[48] Nowhere did Blue Shield explain that the contents of enrollees' confidential communications regarding their health conditions, searches, zip codes, and addresses were being paired with the enrollee's unique IP address and User-Agent or other identifying information and being intercepted through Google's tracking technology (and, as described below, Meta). Notably, Blue Shield's failure to disclose its use of Google Analytics violated Google Analytics' Terms of Service, which required Blue Shield to expressly disclose its use of the software and how it processed and collected data.[49]

120. Blue Shield's various privacy notices were also contradictory. For example, in its Privacy Policy, Blue Shield pledged that "any personal information you provide . . . will be used only in ways consistent with" Blue Shield's HIPAA Notice.[50] The HIPAA notice, in turn, guaranteed that Blue Shield "*will not use your PHI for marketing purposes* without your prior written authorization."[51]

121. But in its Privacy Policy, Blue Shield contradicted itself, stating that its website automatically gathered identifying information, including "*internet protocol (IP) addresses*, browser type[s] . . . [and] device identifier[s]" which it "may combine . . . with *other information* we collect about you" to "improve *marketing*, *analytics*, or site functionality."[52] A reasonable user could not construe these conflicting policies to mean that their sensitive medical information was being intercepted, disclosed, and used it for advertising.

122. Likewise, Blue Shield's Privacy Policy claimed that Blue Shield's website complied with "applicable laws and regulations," but it violated HIPAA and the Wiretap Act by using tracking software to redirect and disclose the contents of enrollees' communications, which included PII and PHI, to third parties without consent. Indeed, the fact that Blue Shield later disclosed the practice indicates that further disclosure was necessary.

---

[48] Blue Shield, "Online and Mobile Privacy Notice," *supra* note 40 (emphasis added).
[49] *See* Google, "Google Analytics Terms of Service," *supra* note 43.
[50] Blue Shield, "Online and Mobile Privacy Notice," *supra* note 40.
[51] Blue Shield, "Notice of Privacy Practices," *supra* note 37 (emphasis added).
[52] Blue Shield, "Online and Mobile Privacy Notice," *supra* note 40 (emphasis added).

123. Google viewed, accessed, and used the information it received from Blue Shield's website for its own purposes, including to provide advertising and other services to Blue Shield and other Google customers. Google's "Privacy & Terms" explains that "Google *uses* the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on our partners' sites and apps."[53]

124. Likewise, Blue Shield used the data intercepted on its cite for targeted advertising and other marketing-related purposes.

125. Indeed, Plaintiffs have seen and been subjected to targeted ads associated with the treatments, conditions, and services they shared and searched for on Blue Shield's website.

**C. Blue Shield's website transmitted PII and PHI to Meta.**

126. In addition to utilizing the Google tracking technologies described above, Blue Shield also embedded and used the Meta Pixel on its website since at least 2018.[54]

**1. How the Meta Pixel Works.**

127. As detailed above, the Meta Pixel is a snippet of code that allows website owners to identify, track, and understand user interactions on a website.[55] According to Meta, the Meta Pixel helps website owners understand how effective their advertising campaigns are and define custom audiences for their targeted advertising campaigns on Facebook and Instagram.[56]

128. As described above, the Meta Pixel is activated when website owners choose to add the snippet of tracking code into their website source code. Once installed, the Meta Pixel tracks users across different devices, browser sessions, and webpages using cookies containing unique identifiers

[53] Google, "Privacy & Terms," archived Mar. 20, 2024, *available at* https://perma.cc/W8KU-BAQR.

[54] In February of 2022, Facebook Pixel changed its name to Meta Pixel, which for both Facebook and Instagram advertising. Facebook and Instagram are social media platforms owned and operated by Meta.

[55] Meta, "About Meta Pixel," archived Sept. 19, 2025, *available at* https://perma.cc/HSC4-72FE.

[56] Meta, "Meta Pixel," archived Sept. 19, 2025, *available at* https://perma.cc/4J7H-2ZPC.

and other identifying information, including information related to the user's device, browser, or location. The Meta Pixel, as configured by Blue Shield, also collected users' PII and PHI.

129. The Meta Pixel uses several methods to identify individual users and their associated communications and behavior on a website. First, the Meta Pixel places cookies on users' web browsers and associates each user's cookies with unique identifiers so that each user is distinguishable. Second, Meta collects identifying information about individual users' devices, browsers, geolocations, timestamps, IP addresses, User-Agents, and device properties. Third, Meta can use Advanced Matching, which collects customer information[57] (including contact information like names, email addresses, and phone numbers, plus other data, like gender, city, and zip code) alongside information about the actions they take on the website, which is called "event data."[58]

130. Meta uses the identifying information it collects to distinguish between individual users and, where applicable, associate this data with users' Facebook or Instagram accounts.

131. Website owners like Blue Shield set up "events" with Meta through the Meta Pixel. An event is an action taken by a user on the website. The Meta Pixel can track three different kinds of events: default, standard, and custom. Each type contains both identifying information and information about the user's communications with the website.

132. Default events are events Meta collects via the Meta Pixel automatically, such as whether a user viewed a particular page.

133. Standard events are created by Meta but activated and managed by website owners. These events include tracking when a user completes a registration, makes a search, or views certain content, among other things.[59]

---

[57] Meta, "Customer Information Parameters," archived Sept. 19, 2025, *available at* https://perma.cc/AR26-KPAD.

[58] Meta defines "event data" as "other information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products." Meta, "Meta Business Tools Terms," archived Sept. 18, 2025, *available at* https://perma.cc/59LC-RDXE.

[59] Meta, "Reference: Standard Events," archived Sept. 19, 2025, *available at* https://perma.cc/TA8E-Z6XD.

134. The Meta Pixel also allows website owners to configure custom events, which are non-standard events created by the website owner to measure specific kinds of user behavior—such as whether a user clicked on a certain link on a website, filled out a form, or clicked a particular button on a webpage. Website owners can assign unique names to custom events.

135. For example, Blue Shield could use custom events to track individuals who started to create an account on the website but did not finish, enrollees who logged into their accounts, or even enrollees who clicked on a button to call a healthcare provider.

136. The enrollee data on the Blue Shield website that Blue Shield configured Meta to intercept consisted of confidential communications, including information about enrollees' providers, health insurance information, and health concerns.

137. While the Meta Pixel (as configured by Blue Shield) intercepted enrollees' confidential communications without their knowledge or consent, Meta paired those communications with the identifying information that Blue Shield configured the pixel to track about individual enrollees.

138. When configured, event data can also be used to define custom audiences to target with a digital advertising campaign, as described above.[60] According to Meta, "[a] custom audience is an ad targeting option that lets you find your existing audiences among people across Meta technologies."[61] The website owner can use Meta's tools to place that user in a particular custom audience.

139. For example, Blue Shield can ask Meta to place enrollees who completed a symptom survey in a custom audience so that Blue Shield can purchase ads from Meta targeting the people in that custom audience.

---

[60] *See* Background § I (Web Tracking Technologies), *supra*.

[61] Meta, "About Custom Audiences," archived Sept. 19, 2025, *available at* https://perma.cc/U6YV-96G7.

140. Website owners can also use Event Data to define lookalike audiences, as described above.[62] Meta does this through finding other users who "share similar characteristics" with the existing users identified by the website owner.[63]

141. The Meta Pixel also allows website owners to track "conversions," which monitor different users' interactions and behavior on a website or app to analyze the effectiveness of ads.[64]

142. When used in tandem, event data can define the audience for the ad campaign while conversions signal whether the ad is reaching that audience.

143. To summarize, Blue Shield configured Meta tools to select which enrollee data was tracked, who it was sent to, and how it was used. Blue Shield's deliberate deployment of the Meta Pixel allowed Blue Shield and Meta to collect event data about Blue Shield's enrollees, including PHI and PII. Blue Shield could then use Meta to target these users as custom audiences for its ad campaigns. Then, by tracking conversions using Meta's tools, Blue Shield could analyze the effectiveness of its targeted ad campaigns on Facebook and Instagram.

144. Meta's Terms prohibits developers from using the Meta Pixel code to share data "that includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[65] Blue Shield nonetheless programmed the Meta Pixel to transmit enrollees' sensitive PII and PHI to Meta and Meta received, read, and used the data despite its Terms.

### 2. Blue Shield used Meta to track and identify enrollees on its website.

145. Cookies were a key component of Meta's tracking on Blue Shield's website. Blue Shield configured the Meta Pixel to use both first-party and third-party cookies on Blue Shield's website. Meta's cookies had different purposes, including tracking a particular visitor across different

---

[62] *See* Background § I (Web Tracking Technologies), *supra*.

[63] Meta, "About lookalike audiences," archived Sept. 19, 2025, *available at* https://perma.cc/99WG-HRSH.

[64] Meta, "Conversion Tracking," archived Sept. 19, 2025, *available at* https://perma.cc/UD8C-MMBY.

[65] Meta, "Meta Business Tools Terms," archived Sept. 18, 2025, *available at* https://perma.cc/59LC-RDXE.

webpages or sessions on the site. As described further below, Blue Shield could program Meta's tools to place several cookies on the browsers of Blue Shield website users, providing multiple ways to track enrollees and distinguish them individually. That is, these cookies facilitated the targeting of enrollees based on their medical conditions and care inquiries.

146. When a user accessed Blue Shield's website, the Meta Pixel started tracking them automatically by placing first-party cookies on their browser. Meta also used third-party cookies, which were placed on visitors' browsers when they accessed Facebook or Instagram or another third-party website that also had the Meta Pixel installed.

147. The cookies were assigned unique identifiers to identify the individual user's browsers or devices, or to pair their information with their Facebook or Instagram accounts (if they were Facebook or Instagram users). These were used for tracking, including to facilitate targeted advertising by Blue Shield.

148. Blue Shield's use of various Meta cookies enabled it to identify individual enrollees even if they weren't logged into Facebook or Instagram account when browsing Blue Shield's website.

149. Blue Shield used a combination of Meta tools—including cookies, browser and device information, and Advanced Matching—to automatically link an enrollee's Facebook or Instagram profile with the data communicated by that enrollee on the Blue Shield website, which consisted of confidential communications, PII, and PHI.

150. By installing the Meta Pixel on its website, Blue Shield was able to redirect enrollees' private and confidential communications, as well as their PII and PHI, and disclose it to Meta for use by both Meta and Blue Shield for Facebook and/or Instagram marketing.

**a) First-party cookies did not require an enrollee to be logged into Facebook or Instagram account to identify them.**

151. Many browsers and privacy browser extensions have started to block third-party cookies from tracking users across the web. By permitting Meta to disguise some of its cookies as first-party cookies on the Blue Shield website, Blue Shield allowed Meta to circumvent these

blockers, obtain the data, disclose it to Meta, and make it available for Blue Shield's and Meta's use for advertising.

152. One first-party cookie Meta offers for tracking purposes is called the _fbp cookie. When the Meta Pixel is installed on a website and first-party cookies are enabled, the Pixel automatically saves the _fbp cookie for the website. Each _fbp cookie is assigned a unique, random string of numbers, in order to follow a particular enrollee across different webpages on Blue Shield's website.[66]

153. As seen below, Blue Shield configured the _fbp cookie to track individual users across the Blue Shield website, even if users had cleared third-party cookies, used cookie-blockers, or used browsers that disabled third-party cookies.




154. The _fbp cookie stores a unique identifier for a specific browser, allowing Meta and Blue Shield to track a user across a website and attribute certain events to them for advertising purposes—even if the user was not logged into their Facebook or Instagram account on that browser.

---

66 Meta, "ClickID and the fbp and fbc Parameters," archived Sept. 19, 2025, *available at* https://perma.cc/B9TM-YMKQ.

155. Meta accomplishes this tracking in two ways.

156. First, if a user has ever logged into Facebook or Instagram on the same browser as they used to log into the Blue Shield website, Meta can tie its Facebook or Instagram-specific cookies to that user's _fbp cookie value, associating the cookies with each other.

157. Second, Meta can identify Facebook or Instagram users via the _fbp cookie by pairing the _fbp cookie with the IP address, User Agent, and device properties associated with the website visitor. By associating Facebook and Instagram accounts with information associated with _fbp cookie values, Meta's tools can identify Facebook or Instagram users browsing the website even if the users have never logged into Facebook or Instagram on the same browser that they used to access the Blue Shield website.

158. Meta's tracking capabilities continue even if a website user clears third-party cookies from their browser, since the _fbp cookie is configured to appear as a first-party cookie from Blue Shield, rather than a Meta cookie.

159. Because Blue Shield configured Meta Pixel to install the _fbp cookie on its website, Meta continued to receive data even if the website user blocked or cleared third-party cookies.

160. Meta's own privacy policy explains how its cookies operate on websites like Blue Shield's to track users who don't have Facebook or Instagram accounts (or who are not logged in):

> Our business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook or Instagram account or are logged in. Specifically, cookies named _fbc or _fbp may be set on the domain of the business partner whose site you're visiting. Unlike cookies that are set on Meta's own domains, these cookies aren't accessible by Meta when you're on a site other than the one on which they were set, including when you are on one of our domains. They serve the same purposes as cookies set in Meta's own domain, which are to personalise content (including ads), measure ads, produce analytics and provide a safer experience, as set out in this Cookies Policy.[67]

[67] Meta, "Cookies Policy," archived Sept. 19, 2025, *available at* https://perma.cc/2W92-386K.

161. Blue Shield configured the first-party _fbp cookie on its website so it could use Meta's technology to personally identify users who were not logged into their Facebook or Instagram accounts, since each user had a unique cookie value associated with their browser.

**b) Blue Shield also used third-party Meta cookies to track enrollees.**

162. In addition to first-party cookies, the Meta Pixel delivers third-party cookies to users' browsers with unique identifiers, including the datr cookie and fr cookie.[68] These cookies are tied to individual browsers and therefore, do not require a website user to be logged into their Facebook or Instagram accounts for Meta to individually identify them.

163. The Meta Pixel also places the c_user cookie on users' browsers. This cookie identifies Facebook users by transmitting a user's Facebook ID number. Practically, that means anyone can easily identify an individual Facebook user profile by simply copying and pasting the cookie's value (i.e., the user's Facebook ID number) into a browser after the Facebook.com website domain.[69] For example, if an individual's c_user cookie value was 4, anyone could use that number to identify that individual user by typing "facebook.com/4" into a web browser.

164. Unlike Meta's other cookies, the c_user cookie requires a Facebook user to have logged into Facebook within one year on the same browser as the website employing the Meta Pixel for Meta to be able to link the website user to their Facebook account.

165. Meta's third-party cookies tracked Blue Shield enrollees and linked there protected data to their Facebook or Instagram accounts.

[68] *Id.*
[69] *Id.*

166. The third-party cookies (i.e., datr, fr, and c_user cookies) and their values tracked enrollees on Blue Shield's website during the relevant period. As shown below, these cookies appear when a user searches for individual family health plans:




167. Together, these Meta cookies were automatically associated with the enrollee while they used the Blue Shield website,[70] allowing Blue Shield and Meta to intercept, track, and uniquely identify an enrollee's actions and communications—including protected communications regarding their health insurance plan and medical care. In other words, the Meta Pixel allowed Blue Shield and Meta to not only track individual enrollees through these cookies, but also to concurrently receive the content of the enrollee's confidential communications with Blue Shield.

**c) The Meta Pixel intercepted PII and PHI in additional ways.**

168. Blue Shield also programmed the Meta Pixel to intercept enrollees' confidential communications, PII, and PHI through "Button Click Data."

[70] Meta, "Cookies Policy," *supra* note 67.

169. This data tracked when enrollees clicked buttons, the labels on those buttons, the page they were on when they clicked the button, and the pages users landed on after clicking.[71] As seen in the picture below, when an enrollee clicked on the "Obstetrics/Gynecology" button, Meta automatically received and viewed highly sensitive PHI and PII without the enrollee's knowledge or consent. The same page tracked enrollees through first-party _fbp cookies, which allowed Meta and Blue Shield to tie the Button Click Data to a specific enrollee.




170. Blue Shield configured the Meta Pixel to automatically intercept enrollees' sensitive medical information and confidential communications related to their healthcare treatment along with their PII and disclose it to Meta. Meta could then, in real-time, associate that enrollee with their Facebook or Instagram accounts, even if the enrollee was not logged into Facebook or Instagram on the same browser, and provide Blue Shield and other advertisers with the data for use in targeted advertising.

[71] Meta, "Meta Pixel," archived Sept. 19, 2025, *available at* https://perma.cc/4J7H-2ZPC.

171. Blue Shield also programmed the Meta Pixel to automatically redirect and disclose information about enrollees, including searches for medical care providers and how they interacted with, contacted, or otherwise searched for certain providers.

172. Blue Shield disclosed sensitive information about the particular health conditions a Blue Shield enrollee was experiencing to Meta when it configured the Pixel to intercept the details of an enrollee's treatment communications, including the specific healthcare providers or specialists the enrollee searched for or contacted. As seen here, when an enrollee clicked on the button to call the particular provider, Blue Shield disclosed to Meta information about the providers' name and the button the enrollee selected.



173. Moreover, when an enrollee filled out a form on the Blue Shield website with several fields of PII or PHI, Blue Shield programmed the pixel to automatically intercept the form field values the user inputted and disclose them to Meta for Meta's and Blue Shield's use.




174. Blue Shield also configured the Meta Pixel to transmit information with custom data that Blue Shield specifically selected for tracking and disclosure. This custom data included highly sensitive PHI, such as information about enrollees' insurance plans, membership information, doctor and specialty searches, and health conditions or concerns. This PHI was disclosed to Meta alongside the enrollees' PII because Blue Shield configured the Meta Pixel to do so.

175. For example, as seen below, Blue Shield configured the Meta pixel to automatically intercept and disclose to Meta details of the enrollees' health insurance, including whether they were

insured, their specific plan information (including plan type), and other highly sensitive and specific information when the enrollee accessed the "Find a Doctor" page.




176. To summarize, Blue Shield programmed and managed the Meta Pixel to automatically intercept and disclose to Meta data that provided multiple methods of tracking enrollees on the Blue Shield website, including those not logged into their Facebook or Instagram accounts. Using cookies, IP addresses, User Agents, device properties, Advanced Matching, and custom information (e.g.,

Button Click Data), Blue Shield used the Meta Pixel to track large amounts of data from enrollees—data which Blue Shield and Meta could then use to individually identify them and serve targeted advertising, including advertising related to the sensitive PHI intercepted on the Blue Shield website.

**III. Blue Shield used Google Analytics and Meta Pixel to increase its profits without consent.**

177. There was no legitimate medical purpose to intercept, disclose, or use PII and PHI as described herein. Instead, Blue Shield intercepted and disclosed PHI so that it (and Google and Meta) could use the data for advertising—despite assuring enrollees in its HIPAA Notice that it would not do so.

178. Specifically, Blue Shield disclosed sensitive PHI and PII so it could use it for its own commercial purposes, including to create lookalike and custom audience for targeted advertising and to track advertising performance.

179. Blue Shield never asked for or received consent to disclose enrollees' PII and PHI to Google, Meta, or any other third parties or to use it for marketing purposes, thereby violating federal HIPAA regulations and California law.

**IV. Blue Shield knew or had reason to know that the sensitive data it was using was unlawfully intercepted.**

180. At all times, Blue Shield knew and controlled what data was being intercepted from its website and disclosed to Google and Meta. Indeed, as described above, Blue Shield was the architect of this tracking: it installed Google's and Meta's tracking technologies to intercept enrollees' communications on its website and actively monitored and managed what data was being collected and from which pages. When Blue Shield logged in to use either the Google or Meta tracking tools, it could see what data had been intercepted and create analyses and reports using that data.

181. Blue Shield knew or had reason to know that the data was unlawfully intercepted.

182. Blue Shield programmed the tracking tools on its website to intercept PHI and PII and disclose it to Meta and Google despite its own admissions that it was governed by HIPAA, which prohibits covered entities from knowingly disclosing individually identifiable health information to any other person. Indeed, Blue Shield undertook its tracking strategy for the express purpose of

conducting advertising that HIPAA prohibits without express consent—despite Blue Shield's HIPAA Notice promising enrollees that Blue Shield "*will not use your PHI for marketing purposes* without your prior written authorization."[72] As the author of its terms and policies, Blue Shield knew that it had never sought or received the consent that HIPAA requires for its conduct.

183. Blue Shield undertook its tracking scheme with the tortious intent of invading its enrollees' reasonable expectations of privacy in their medical data and using data protected by federal and California law for prohibited purposes.

184. Blue Shield's internal documents confirm that [redacted].

185. Blue Shield had additional reason to know that its conduct was unlawful because both Google's and Meta's policies prohibit the use of their tracking and ad servicing tools to capture sensitive medical information.

186. Google warns HIPAA-covered customers like Blue Shield that they "must not use Google Analytics in a way that implicates Google's access to, or collection of, PHI."[73] Blue Shield programmed Google Analytics to collect and disclose to Google sensitive PHI and PII nonetheless.

187. Google's terms also warned that "[a]uthenticated pages" and "[u]nauthenticated pages that are related to the provision of health care services" are "likely to be HIPAA-covered" and that "customers *should not set Google Analytics tags*" on those pages.[74] Blue Shield did so anyway, including by placing Google tracking code on authenticated pages of its website—i.e., pages enrollees must log in to see.

188. Likewise, Meta's Terms prohibited Blue Shield from using Meta Pixel to share data "that includes health, financial information or other categories of sensitive information (including any

---

[72] Blue Shield, "Notice of Privacy Practices," *supra* note 37 (emphasis added).

[73] Google, "HIPAA and Google Analytics," archived Nov. 10, 2023, *available at* bit.ly/4gv7SoS (emphasis added).

[74] *Id.*

information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[75] Blue Shield nonetheless programmed the Meta Pixel to contemporaneously transmit and disclose enrollees' sensitive PII and PHI to Meta.

189. Additionally, beginning no later than August 2021, Blue Shield [redacted].

190. Blue Shield therefore knew or should have known that it was disclosing and using intercepted data for a prohibited and unlawful purpose.

**V. Blue Shield's wrongful disclosure harmed Plaintiffs and other class members.**

191. Medical information is extremely private. As one National Institutes of Health report explained, "[w]hen personally identifiable health information . . . is disclosed to an employer, insurer, or family member, it can result in stigma, embarrassment, and discrimination."[76] Due to the severity of these consequences, "without some assurance of privacy, people may be reluctant to provide candid and complete disclosures of sensitive information even to their physicians."[77]

192. Personal data—and particularly health information—also has enormous value.

193. The tech industry's largest players actively monetize the collection, sale, and use of consumer data. Health data is generally considered to be the most valuable. Some health records are worth as much as $1,000 on the dark web.[78]

194. Healthcare organizations, like Blue Shield, sell health information to a variety of market players, including advertising platforms, pharmaceutical companies, researchers, and data

---

[75] Meta, "Meta Business Tools Terms," archived Sept. 18, 2025, *available at* https://perma.cc/59LC-RDXE.

[76] Sharyl J. Nass, et al., "Beyond the HIPAA Privacy Rule," archived Nov. 13, 2023, *available at* https://perma.cc/SBR9-3C43.

[77] *Id.*

[78] Sanjay Cherian, "Healthcare Data: The Perfect Storm," Forbes (Jan. 14, 2022), *available at* https://perma.cc/898S-F6UF.

brokers.[79] Pharmaceutical companies use health information to "understand patient behaviors," and to "empower salesforce to market drugs more effectively," while advertising platforms, like Google and Meta, use such data "to allow for more precise ad targeting."[80] Some estimates place the value of individual medical records at up to $125, while entire health databases have sold for up to $500,000.[81]

195. Given the value and sensitivity of personal health information, federal regulators have increasingly cracked down on companies that misuse this data. In July 2022, the FTC stated that it was "committed to fully enforcing the law against illegal use and sharing of highly sensitive data."[82]

196. Blue Shield ignored its obligations to keep enrollees' PII and PHI safe by configuring Google and Meta tools on its website to surreptitiously intercept Plaintiffs' and Class members' valuable medical information. In the process, Blue Shield deprived Plaintiffs and those similarly situated of the value of their personal information. Blue Shield further denied Plaintiffs the ability to choose how, when, and with whom their data was shared. As a result, Plaintiffs' communications with Blue Shield's website, including search terms related to sensitive health conditions, physician preferences, and needed treatments, are irretrievably in Google's and Meta's hands.

197. Blue Shield's conduct also undermined enrollees' relationships with their healthcare providers. Because of Blue Shield's actions, enrollees cannot interact with physicians or seek treatment through Blue Shield's website without fearing that their sensitive information is being automatically shared with unknown third parties and for uses to which they do not consent.

198. Plaintiffs were subjected to targeted and personalized advertisements based on the PHI and PII intercepted from Blue Shield's website. Plaintiffs have experienced emotional distress in the knowledge that the sensitive health information they communicated to Blue Shield's website was automatically and routinely shared with the world's largest tech companies, Google and Meta.

---

[79] Todd Zigrang and Jessica Bailey-Wheaton, "Valuing Healthcare Data," The Value Examiner (July-Aug. 2023), *available at* https://perma.cc/ZX9X-KN7W.

[80] *Id*.

[81] Carol Gibbons, "What is the Price of a Medical Record?," Med. Econ. (July 15, 2017), *available at* https://perma.cc/2GH8-4SRA.

[82] Kristen Cohen (FTC), "Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data," July 11, 2022, *available at* https://perma.cc/U53L-B4EY.

## VI. Plaintiff-specific Allegations

### A. Austin Kahn's experience with Blue Shield's website

199. Plaintiff Kahn is a Class member. He is a current Blue Shield enrollee and has been since approximately 2019. Plaintiff Kahn has received medical care covered by Blue Shield on a regular basis since at least 2019.

200. Plaintiff Kahn logged in and used Blue Shield's website on his desktop computer, laptop computer, and mobile phone to obtain medical care, treatment, and/or information from Blue Shield.

201. Plaintiff Kahn did not consent to Blue Shield disclosing his PII and PHI to Google or Meta. He did not consent to its use by Meta or Google for any purpose, or to its use by Blue Shield for targeted advertising or other marketing purposes.

202. Plaintiff Kahn provided and communicated his PII and PHI to Blue Shield when he used the Blue Shield website, beginning around 2019 and continuing to the present. These communications included intimate and sensitive health data.

203. Specifically, Plaintiff Kahn used the website to register for an account, find doctors using the "Find a Doctor" tool (including specialists for his specific and sensitive healthcare needs), use telehealth services, research prior authorizations, complete online forms, make payments, review billing statements or claim summaries regarding his treatment, shop for and research alternative plans, review Explanations of Benefits, and search for member discounts, among other uses. Plaintiff Kahn also used the Blue Shield website to schedule and receive treatment and specialty referrals for medical symptoms and conditions. He was referred to and received medical treatment, communications, and/or information in relation to his symptoms through the Blue Shield website.

204. When he communicated with Blue Shield and its agents via Blue Shield's website, he reasonably expected that—as a Blue Shield enrollee and a patient seeking treatment—his communications and PHI were confidential and would not be disclosed to Google, Meta, or any other third parties, or used for marketing purposes without his knowledge or consent.

205. When Plaintiff Kahn communicated his private information and intimate health data to the Blue Shield website, his searches and queries, requests, and the contents of his communications were automatically sent to Google and Meta alongside his device information, IP address, User Agent, and personal cookies, Google Client ID, and additional personal identifiers, which revealed to those third parties his real-world identity and allowed for his data to be personally identifiable.

206. Plaintiff Kahn is a Google accountholder and regularly accessed his Gmail account. He is also an Instagram user.

207. Plaintiff Kahn did not receive notice and had no opportunity to consent to the disclosure of his PII and PHI from the Blue Shield website to Google, Meta, or any other third parties for their benefit or for the benefit of Blue Shield. Nor did he receive notice of or consent to the use of his PII and PHI by Google or Meta or to their use by Blue Shield for marketing purposes.

208. The information obtained by Blue Shield from Plaintiff Kahn and disclosed to Google, Meta, and other third parties consisted of sensitive medical and otherwise private information that Plaintiff Kahn would not have disclosed had he known the information would be transmitted to third parties or used in marketing efforts.

209. Plaintiff Kahn received Blue Shield's Notice of Data Breach, which—as described above—confirmed that Google obtained Plaintiff Kahn's communications with Blue Shield (and the PII and PHI embedded in those communications) via Google Analytics. This disclosure was a direct result of Blue Shield installing, managing, and using Google Analytics on the Blue Shield website—which Blue Shield encouraged its enrollees, including Plaintiff Kahn, to use in conjunction with obtaining medical care. Google was thereby able to connect and associate his protected information with other information in its possession, use it for retargeting and other marketing purposes, and track and profile Plaintiff Kahn.

210. Blue Shield knew it was disclosing Plaintiff Kahn's sensitive PII and PHI to Google, Meta, and other third parties for targeted advertising and for other marketing purposes, in contravention of its representations to all its website users, in violation of federal and California state law, and in contravention of Google's and Meta's policies regarding use of their tracking tools.

211. Plaintiff Kahn has a continuing interest in ensuring that his future communications with Blue Shield are protected and safeguarded from future unauthorized disclosure and use and in knowing the precise categories of information disclosed, to whom, and for what purpose.

212. Plaintiff Kahn suffered damages caused by Blue Shield's conduct, including in the form of (i) invasion of his privacy; (ii) statutory damages; (iii) the continued and ongoing risk to his PII and PHI, which remains in Blue Shield's (and Google's) possession and is subject to further disclosure, and associated costs; (iv) the continued and ongoing risk of harassment and targeted advertisements specific to Plaintiff Kahn's medical conditions and other confidential information he communicated to Blue Shield via its website; (v) time spent reviewing and responding to the Notice of Data Breach sent by Blue Shield; and (vi) the emotional distress, shame, and embarrassment of having his personal health information disclosed to and used by third parties without his knowledge or consent.

**B. Rachel Markovitz's experience with Blue Shield's website**

213. Plaintiff Markovitz is a Class member. She is a current enrollee of Blue Shield's insurance plans and has been since 2022. Plaintiff Markovitz has received medical care covered by Blue Shield on a regular basis since 2022.

214. Plaintiff Markovitz logged in and used Blue Shield's website on her desktop computer, laptop computer, and mobile phone to obtain medical care, treatment, and/or information from Blue Shield.

215. Plaintiff Markovitz did not consent to Blue Shield disclosing her PII and PHI to Google and Meta. She did not consent or to its use by Meta or Google for any purpose, or its use by Blue Shield for targeted advertising or other marketing purposes.

216. Plaintiff Markovitz provided and communicated her PII and PHI to Blue Shield when she used the Blue Shield website beginning around 2022 and continuing to the present. These communications included her intimate and sensitive medical data.

217. Specifically, Plaintiff Markovitz used the Blue Shield website to search for in-network providers using the "Find a Doctor" tool, clicked the "Explore care options" button and explored that

webpage to learn about urgent care options, and made searches regarding prior authorizations. She also used the site to register for an account, review billing statements or claim summaries, and schedule and receive treatment and specialty referrals for medical symptoms and conditions, among other uses. She was referred to and received medical treatment, communications, and/or information in relation to her symptoms through the Blue Shield website.

218. When she communicated with Blue Shield and its agents via the website, Plaintiff Markovitz reasonably expected that—as a Blue Shield enrollee and a patient seeking treatment—her communications and PHI were confidential and would not be disclosed to by Google, Meta, or any other third parties, or used for marketing purposes without her knowledge or consent.

219. When Plaintiff Markovitz entered her private information and intimate health data on the Blue Shield website, her searches and queries, requests, and the contents of her communications were automatically disclosed to Google and Meta alongside her device information, IP address, User Agent, and personal cookies, Google Client ID, Facebook ID, and additional personal identifiers, which revealed to those third parties her real-world identity and allowed for her data to be linked to her.

220. Plaintiff Markovitz is a Google accountholder and regularly accessed her Gmail account. She is also a Facebook and Instagram user.

221. Plaintiff Markovitz did not receive notice and had no opportunity to consent to the disclosure of her PII and PHI from the Blue Shield website to Google, Meta, or any other third parties for their benefit. Nor did she receive notice of or consent to the use of her PII and PHI by Google or Meta or to their use by Blue Shield for marketing purposes.

222. The information obtained by Blue Shield from Plaintiff Markovitz and disclosed to Google, Meta, and other third parties consisted of sensitive medical and otherwise private information that Plaintiff Markovitz would not have disclosed had she known the information would be transmitted to third parties or used in marketing efforts.

223. Plaintiff Markovitz received Blue Shield's Notice of Data Breach, which—as described above—confirmed that Google obtained Plaintiff Markovitz's communications with Blue

Shield (and the PII and PHI embedded in those communications) automatically via Google Analytics. These disclosures—as well as the disclosure of similar protected communications to Meta—were the direct result of Blue Shield installing, managing, and using Google Analytics and Meta Pixel on the Blue Shield website—which Blue Shield encouraged its enrollees, including Plaintiff Markovitz, to use in conjunction with obtaining medical care. Google and Meta were thereby able to connect and associate her protected information with other information in their possession for retargeting and other marketing purposes and to track and profile Plaintiff Markovitz.

224. Blue Shield knew it was disclosing Plaintiff Markovitz's sensitive PII and PHI to Google, Meta, and other third parties for targeted advertising and for other marketing purposes in contravention of its representations to all its website users, in violation of federal and California state law, and in contravention of Google and Meta's own policies regarding use of their tracking tools.

225. Plaintiff Markovitz has a continuing interest in ensuring that her future communications with Blue Shield are protected and safeguarded from future unauthorized disclosure and use, and in knowing the precise categories of information disclosed, to whom, and for what purpose.

226. Plaintiff Markovitz suffered damages caused by Blue Shield's conduct, including in the form of (i) invasions of her privacy; (ii) statutory damages; (iii) the continued and ongoing risk to her PII and PHI, which remains in Blue Shield's (and Meta's and Google's) possession and is subject to further disclosure, and associated costs; (iv) the continued and ongoing risk of harassment and targeted advertisements specific to Plaintiff Markovitz's medical conditions and other confidential information she communicated to Blue Shield via its website; (v) time spent reviewing and responding to the Notice of Data Breach sent by Blue Shield; and (vi) the emotional distress, shame, and embarrassment of having her personal health information disclosed to Google, Meta, and other third parties and used for marketing purposes without her knowledge or consent.

### C. Susan Reiman's experience with Blue Shield's website

227. Plaintiff Reiman is a Class member. She was an enrollee of Blue Shield's insurance plans between 1978 and 2018 or 2019. Plaintiff Reiman received medical care covered by Blue Shield on a regular basis between during that period.

228. Plaintiff Reiman logged in and used Blue Shield's website on her desktop computer, laptop computer, and mobile phone to obtain medical care, treatment, and/or information from Blue Shield.

229. Plaintiff Reiman did not consent to Blue Shield disclosing her PII and PHI to Google and Meta. She did not consent or to its use by Meta or Google for any purpose, or its use by Blue Shield for targeted advertising or other marketing purposes.

230. Plaintiff Reiman provided and communicated her PII and PHI to Blue Shield when she used its website, beginning around December of 2013 and continuing to 2023 or 2024. These communications included her intimate and sensitive medical data.

231. Specifically, Plaintiff Reiman used the Blue Shield website to register for an account, find doctors, and review billing statements or claim summaries, among other uses. For example, Plaintiff Reiman used the "Find a Doctor" webpage to search for in-network providers regarding her sensitive healthcare and treatment. She used the NurseHelp 24/7 tool to ask a registered nurse a question. Plaintiff Reiman completed online forms on Blue Shield's website and made searches for member discounts while logged into the site. Plaintiff Reiman also used the website to schedule and receive treatment and specialty referrals for medical symptoms and conditions. She also used the website to file a claim, make payments, and review billing statements. She was referred to and received medical treatment, communications, and/or information in relation to her symptoms through the site.

232. Plaintiff Reiman continued to use the Blue Shield website even after her healthcare coverage ended in 2018 or 2019 to retrieve medical records and billing information.

233. When she communicated with Blue Shield and its agents via the website, Plaintiff Reiman reasonably expected that—as Blue Shield enrollee and a patient seeking treatment—her

communications and PHI were confidential and would not be disclosed to Google, Meta, or any other third parties, or used for marketing purposes, without her knowledge or consent.

234. When Plaintiff Reiman communicated her private and intimate health information on the Blue Shield website, her searches and queries, requests, and the contents of her communications were automatically sent to Google and Meta alongside her device information, IP address, User Agent, and personal cookies, Google Client ID, Facebook ID, and additional personal identifiers, which revealed to those third parties her real-world identity and allowed for her data to be linked to her.

235. Plaintiff Reiman is a Google accountholder and regularly accessed her Gmail account. She is also a Facebook user.

236. Plaintiff Reiman did not receive notice and had no opportunity to consent to the disclosure of her PII and PHI from the Blue Shield website to Google, Meta, or any other third parties for their benefit. Nor did she receive notice of or consent to the use of her PII and PHI by Google or Meta or to their use by Blue Shield for marketing purposes.

237. The information obtained by Blue Shield from Plaintiff Reiman and disclosed to Google, Meta, and other third parties consisted of sensitive medical and otherwise private information that Plaintiff Reiman would not have disclosed had she known the information would be transmitted to third parties or used in marketing efforts.

238. Plaintiff Reimann received Blue Shield's Notice of Data Breach, which—as described above—confirmed that Google obtained Plaintiff Reiman's communications with Blue Shield (and PII and PHI embedded in those communications) automatically via Google. These disclosures—and similar disclosures to Meta—were the direct result of Blue Shield installing, managing, and using Google Analytics and Meta Pixel on the Blue Shield website—which Blue Shield encouraged its enrollees, including Plaintiff Reiman, to use in conjunction with obtaining medical care. Google and Meta was thereby able to connect and associate it with other information in its possession for retargeting and other marketing purposes and track and profile Plaintiff Reiman.

239. Blue Shield knew it was disclosing Plaintiff Reiman's sensitive PII and PHI to Google, Meta, and other third parties for targeted advertising and marketing purposes in contravention of its representations to all its website users, in violation of federal and California state law, and in contravention of Google and Meta's own policies regarding use of their tracking tools.

240. While she was a Blue Shield member, Plaintiff Reiman had an interest in ensuring that her communications with Blue Shield were protected and safeguarded from future unauthorized disclosure and in knowing the precise categories of information disclosed, to whom it was disclosed, and why it was disclosed. To the extent the need arises for Plaintiff Reimann to use the site again—including to look up past claim, treatment, or billing information—she has a continuing interest in ensuring that her future communications with Blue Shield via its website are protected and safeguarded from unauthorized disclosure and use, and in knowing the precise categories of information disclosed, to whom, and for what purpose.

241. Plaintiff Reiman suffered damages caused by Blue Shield's conduct, including in the form of (i) invasions of her privacy; (ii) statutory damages; (iii) the continued and ongoing risk to her PII and PHI, which remains in Blue Shield's (and Meta's and Google's) possession and is subject to further disclosure, and associated costs; (iv) the continued and ongoing risk of harassment, and targeted advertisements specific to Plaintiff Reiman's medical conditions and other confidential information she communicated to Blue Shield via its website; (v) time spent reviewing and responding to the Notice of Data Breach sent by Blue Shield; and (vi) the emotional distress, shame, and embarrassment of having her personal health information disclosed to Google, Meta, and other third parties and used for marketing purposes without her knowledge or consent.

## CLASS ACTION ALLEGATIONS

242. Plaintiffs incorporate all prior allegations.

243. Plaintiffs bring this action individually and on behalf of a class (the "Class") under Federal Rule of Civil Procedure 23.

244. Like Plaintiffs, Class members are Blue Shield enrollees who used Blue Shield's website and related webpages to search for doctors, health conditions, symptoms, and/or treatments.

245. The confidential content of Plaintiffs' and Class members' communications with Blue Shield's website was automatically intercepted and disclosed to Google and Meta without Plaintiffs' and Class members' consent. The intercepted information included intimate details about enrollees' health—content that is highly private and protected by federal and state law. The contents of these communications were paired with identifying information and later used for unauthorized marketing practices by Google, Meta, and Blue Shield. Blue Shield is thus liable to Plaintiffs and Class members for violating their rights under federal law.

246. Plaintiffs seek to certify the following Class:

> All United States residents who, at any point during the Class Period, were Blue Shield enrollees and had their PII and/or PHI disclosed to Google and/or Meta via the Blue Shield website.

247. Plaintiffs reserve the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

248. The Class Period spans from 2012 to 2025, or the period during which Google Analytics and/or the Meta Pixel were installed on Blue Shield's website.[83]

249. Specifically excluded from the Class are Blue Shield's officers, directors, employees, and agents; any entity in which Blue Shield has a controlling interest; and affiliates, legal representatives, attorneys, successors, heirs, or assigns of Blue Shield. Also excluded from the Class is any judicial officers to whom this case is assigned, their families, and members of their staff.

250. **Numerosity**: The members of the Class are so numerous that joinder of all members of the Class is impracticable. The proposed Class contains at least hundreds of thousands of individuals whose health information was intercepted on Blue Shield's website, disclosed to Meta and Google, and used for unauthorized marketing purposes.

[83] Plaintiffs reserve the right to amend the Class Period upon discovery of the exact dates Blue Shield configured and sued Google and Meta's tracking technologies its website.

251. **Predominance**: There are questions of law and fact common to all Class members that predominate over any questions affecting only individual Class members. These common questions include:

a. Whether the contents of Plaintiffs' and Class members' electronic communications were automatically and contemporaneously intercepted;

b. Whether through Blue Shield's installation and configuration of Google Analytics and the Meta Pixel on its website, the contents of Plaintiffs' and Class members' communications with Blue Shield's website—including PII and PHI—were automatically intercepted and disclosed to Google and Meta;

c. Whether Blue Shield intentionally disclosed the contents of Plaintiffs' and Class members' intercepted communications while knowing or having reason to know that the contents had been obtained through an unlawful interception;

d. Whether Blue Shield intentionally used the contents of Plaintiffs' and Class members' intercepted communications while knowing or having reason to know that the contents had been obtained through an unlawful interception;

e. Whether, Blue Shield's installation and configuration of Google Analytics and the Meta Pixel on its website, Plaintiffs and Class members' PII and PHI were intercepted and transmitted to Google and Meta while the communications on Blue Shield's website were taking place;

f. Whether Blue Shield obtained consent for its disclosure and use of Plaintiffs' and Class members' communications with Blue Shield's website, including PII and PHI;

g. Whether Blue Shield violated the Wiretap Act;

h. Whether Plaintiffs and Class members are entitled to injunctive and equitable relief; and

i. Whether Plaintiffs and Class members are entitled to actual, compensatory, statutory, or punitive damages, statutory penalties, or restitution, as allowable by law.

252. **Typicality**: Plaintiffs' claims are typical of the claims of Class members. They arise from the same conduct by Blue Shield involving the use of Google Analytics and the Meta Pixel and are based on the same legal theories.

253. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of Class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of Class members. Plaintiffs' counsel are competent and experienced in litigating complex and mass actions.

254. **Superiority**: A class action is a superior method for the fair and efficient adjudication of this case. This proposed class action presents fewer management difficulties than individual litigation and will permit an orderly and expeditious administration of Class claims, fostering economies of time, effort, and expense. If the Class members are forced to bring individual suits, the transactional costs, including those incurred by Blue Shield, will significantly increase, and the courts will be clogged with a multiplicity of lawsuits involving identical subject matter, fact patterns, and legal issues.

255. **Injunctive and Declaratory Relief**: Blue Shield has acted or refused to act on grounds generally applicable to the Class, thereby making it appropriate for this Court to grant injunctive and corresponding declaratory relief with respect to the Class as a whole.

## TOLLING OF THE STATUTES OF LIMITATIONS

256. All applicable statute(s) of limitations have been tolled by Blue Shield's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could not have reasonably discovered Blue Shield's use and configuration of Google's and Meta's online tracking tools or the resulting interception, disclosure, and use of their PHI and PII until shortly before this class action litigation commenced.

257. Blue Shield was and remains under a continuing duty to disclose to Plaintiffs and Class members its practice of disclosing and using PHI and PII. As a result of the active concealment by Blue Shield, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(c) - Intentional Disclosure (On Behalf of Plaintiffs and the Class)**

258. Plaintiffs incorporate all prior allegations.

259. Section 2511(1)(c) of the Wiretap Act makes it unlawful for a person to "intentionally disclose[], or endeavor[] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection."[84]

260. Section 2520(a) provides a private right of action to a person whose electronic communication is disclosed in violation of the Act.

261. Plaintiffs' and Class members' communications with Blue Shield's website were "electronic communications" within the meaning of 18 U.S.C. § 2510(12). They involved transfers of data and intelligence through systems affecting interstate commerce, including searches for medical conditions, symptoms, providers, specialties, treatments, and services; "Find a Doctor" searches, criteria, and results; form-field values; membership information; claim and payment information; login and account activity; button clicks; and URLs reflecting those inputs and selections.

262. Those communications contained protected "contents" within the meaning of 18 U.S.C. § 2510(8) because the data revealed the substance, purport, and meaning of what Plaintiffs and Class members communicated to Blue Shield—not merely routing or record information. The intercepted contents contained, among other things, information about the medical conditions, symptoms, providers, specialties, treatments, services, insurance-plan information, claims, and payment information about which each enrollee communicated.

263. Blue Shield disclosed those contents to Google and Meta, who obtained them through "interception" within the meaning of 18 U.S.C. § 2510(4). As alleged above, Google Analytics and

[84] 18 U.S.C. § 2511(1)(c).

the Meta Pixel automatically and contemporaneously acquired copies of the contents through electronic tracking devices, installed and configured by Blue Shield on its website, the moment an enrollee entered a search term, browsed to a new page, selected a filter or provider, submitted a form, logged in, clicked a button, accessed an account page, or otherwise interacted or communicated with the site. This data was redirected from Blue Shield's website to Google and Meta. Each acquisition occurred contemporaneously while each communication was in transit to and being received by Blue Shield's destination server, and before the communication entered electronic storage.

264. These interceptions violated Section 2511. Plaintiffs and Class members did not consent to Blue Shield's disclosure to Google or Meta, or Google's or Meta's acquisition of their communications. Neither Google nor Meta was the addressee or intended recipients of communications that enrollees directed to their health insurer.

265. To the extent Blue Shield's purported consent is asserted under Section 2511(2)(d), the exception does not apply because at least one primary purpose of the interceptions was to commit criminal or tortious acts independent of the interceptions themselves: the unauthorized disclosure and commercial use of individually identifiable health information for marketing purposes in violation of 42 U.S.C. § 1320d-6, which provides for criminal penalties; in violation of 45 C.F.R. § 164.508(a)(1); and in violation of Plaintiffs and Class members reasonable expectations of privacy—constituting a highly offensive intrusion under California statutory and common law and an invasion of rights enshrined in California constitutional law.

266. Blue Shield's actions would also be subject to enhanced penalties under 42 U.S.C. § 1320d-6 because its use of Google Analytics and the Meta Pixel was for commercial advantage, including marketing, advertising, and increasing revenues from Plaintiffs and Class members, as well as soliciting new customers.

267. The contents of Plaintiffs' and Class members' protected communications were intercepted to identify, profile, segment, and target enrollees for advertising and other commercial gain in violation of HIPAA and other laws.

268. Blue Shield's conduct further constituted a tortious act because it violated the HIPAA Privacy Rule when it disclosed its patient lists to Google and Meta in exchange for the use of Google Analytics and the Meta Pixel (and the market research and consumer analysis obtained from those tools), without obtaining Plaintiffs' and Class members' prior written authorization. Although Google Analytics and the Meta Pixel can be used for free, the implicit cost of these technologies was Plaintiffs' and Class members' identifying information and protected health data. Plaintiffs and Class members' PII and PHI has enormous market value, including to Google, Meta, and Blue Shield. Both Google and Meta use the information gathered from Plaintiffs and Class members to improve their analytics insights and advertising services for Blue Shield and other website owner customers. Blue Shield also used enrollees' PII and PHI for targeted advertising campaigns via Google Ads and on Facebook and Instagram.

269. Blue Shield, Google, and Meta intentionally received, read, and used information produced by those interceptions. Google Analytics and the Meta Pixel returned the intercepted contents to Blue Shield through analytics dashboards, event-level data, reports, audience tools, conversion-flow analyses, and advertising interfaces. Blue Shield could—and did—log in, view what had been intercepted, pull event information for particular users or actions, analyze and export event-level data, review search and "Find a Doctor" activity, create audience segments, use the data for marketing, and measure how enrollees responded to advertising.

270. After receiving the contents of Plaintiffs and Class members' unlawfully intercepted communications, Blue Shield intentionally disclosed and re-disclosed them to other persons, including Google (for use in Google Ads) and Meta (for use in its advertising services). Blue Shield's installation, programming, and management of Meta and Google's tracking technologies resulted in the disclosure of enrollees' protected communications to Meta and Google. Blue Shield deliberately selected the pages, events, fields, identifiers, and communications to be tracked; enabled Google Signals; and configured the Meta Pixel, Advanced Matching, and custom events. Blue Shield deliberately linked Google Analytics to Google Ads; created and activated custom audiences; directed

that audience, conversion, and campaign data to be transmitted through Google's and Meta's advertising systems; and selected and designed the ads to be served (and on whom).

271. These were disclosures by Blue Shield, not merely acquisitions or independent acts by Google or Meta. Blue Shield controlled what communications and identifiers were disclosed, which tracking and advertising functions were enabled, which audiences were created, and when the Google Analytics–Google Ads connection was maintained or severed. Blue Shield's 2025 Notice of Data Breach confirms that its configuration allowed member data, including PII and PHI, to be shared with Google Ads.

272. Blue Shield made these disclosures intentionally. Google Analytics and the Meta Pixel could not collect or transmit the contents of Plaintiffs and Class members' confidential communications unless Blue Shield placed and configured third-party code on particular webpages and enabled the relevant functions. Blue Shield's repeated configuration choices, active management of the tools, use of the resulting dashboards and reports, creation of audiences and campaigns, and eventual decision to sever the Google Analytics–Google Ads connection show that the disclosures were the intended operation of systems Blue Shield designed and controlled, not an accidental transmission.

273. When Blue Shield disclosed the contents of Plaintiffs and Class members' confidential communications, it knew or had reason to know that the information had been obtained through an unlawful interception. Blue Shield was the architect and active manager of the real-time tracking. It knew the data came from automatic, contemporaneous acquisition of enrollees' protected communications on its website; could see the intercepted information in Google's and Meta's tools; was warned not to place Google Analytics tags on authenticated or healthcare-related pages or permit Google to collect PII and PHI and agreed to Google's terms restricting the collection of PHI; was warned not to send health data or HIPAA-protected information to Meta or use it to create custom audiences or in advertising; knew its own HIPAA obligations—as reflected in its HIPAA notices, privacy notices, internal documents, and its terms with various vendors—and that the intercepted data was protected; and knew that it had never informed enrollees of its conduct, nor had it ever sought or

received valid enrollee authorization. Blue Shield nevertheless continued using the tracking and advertising functions. Blue Shield therefore knew both how the information had been acquired and the facts that made the acquisition unlawful.

274. Plaintiffs and Class members did not authorize or consent to Blue Shield's disclosure of the contents of their intercepted communications to Google or Meta, or their respective advertising services. Blue Shield's Privacy Policy and HIPAA Notice did not clearly disclose the challenged practices. Indeed, Blue Shield represented to Plaintiffs and Class members that their PHI would not be used for marketing without prior written authorization. No such authorization was ever provided. Therefore, no statutory exception authorized Blue Shield's intentional disclosures.

275. Blue Shield's violations of Section 2511(1)(c) caused Plaintiffs and Class members injury and damages, including invasion of privacy, loss of control over confidential health communications, exposure of PII and PHI to unauthorized third parties, and the other harms alleged above.

276. Under 18 U.S.C. § 2520(b)(1)-(3), Plaintiffs and Class members seek all available equitable and declaratory relief, actual or statutory damages, punitive damages, reasonable attorneys' fees, and litigation costs.

## SECOND CLAIM FOR RELIEF

### Violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(d) - Intentional Use
### (On Behalf of Plaintiffs and the Class against Blue Shield)

277. Plaintiffs incorporate all prior allegations.

278. Section 2511(1)(d) of the Wiretap Act makes it unlawful for a person to "intentionally use[], or endeavor[] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection."[85]

279. Section 2520(a) provides a private right of action to a person whose electronic communication is intentionally used in violation of the Act.

---

[85] 18 U.S.C. § 2511(1)(d).

280. Plaintiffs' and Class members' communications with Blue Shield's website were "electronic communications" within the meaning of 18 U.S.C. § 2510(12). They involved transfers of data and intelligence through systems affecting interstate commerce, including searches for medical conditions, symptoms, providers, specialties, treatments, and services; "Find a Doctor" searches, criteria, and results; membership details; form-field values; claim and payment information; login and account activity; button clicks; and URLs reflecting those inputs and selections.

281. Those communications contained protected "contents" within the meaning of 18 U.S.C. § 2510(8), because the data revealed the substance, purport, and meaning of what Plaintiffs and Class members communicated to Blue Shield—not merely routing or record information. The intercepted contents disclosed, among other things, the medical conditions, symptoms, providers, specialties, treatments, services, insurance-plan information, claims, and payment information about which each enrollee communicated.

282. Google and Meta obtained those contents through "interception" within the meaning of 18 U.S.C. § 2510(4). As alleged above, Google Analytics and the Meta Pixel automatically and contemporaneously acquired copies of the contents through electronic tracking devices, placed and configured by Blue Shield on its website, at the moment an enrollee entered a search term, clicked to a new page, selected a filter or provider, submitted a form, logged in, clicked a button, accessed an account page, or otherwise communicated or interacted with the site. This data was redirected from Blue Shield's website to Google and Meta. Each acquisition occurred contemporaneously while each communication was in transit to and being received by Blue Shield's destination server, and before the communication entered electronic storage.

283. These interceptions violated Section 2511. Plaintiffs and Class members did not consent to Blue Shield's redirection to Google or Meta, Google's or Meta's acquisition of their communications, or the use of this data for commercial or marketing purposes by Google, Meta, or Blue Shield. Neither Google nor Meta was the addressees or intended recipient of communications that enrollees directed to their health insurer.

284. To the extent Blue Shield's purported consent is asserted under Section 2511(2)(d), the exception does not apply because at least one primary purpose of the interceptions was to commit criminal or tortious acts independent of the interceptions themselves: the unauthorized disclosure and commercial use of individually identifiable health information, including for marketing purposes, in violation of 42 U.S.C. § 1320d-6, which provides for criminal penalties; in violation of 45 C.F.R. § 164.508(a)(1); and in violation of Plaintiffs and Class members reasonable expectations of privacy—constituting a highly offensive intrusion under California statutory and common law and an invasion of rights enshrined in California constitutional law.

285. Blue Shield's actions would also be subject to enhanced penalties under 42 U.S.C. § 1320d-6 because its use of Google Analytics and the Meta Pixel was for commercial advantage, including for marketing, advertising, and increasing revenues from Plaintiffs and Class members, as well as soliciting new customers.

286. The contents of Plaintiffs' and Class members' confidential communications were intercepted to identify, profile, segment, and target enrollees for advertising and other commercial gain in violation of HIPAA and other laws.

287. Blue Shield's conduct also constituted a tortious act because it violated the HIPAA Privacy Rule by disclosing its patient lists to Google and Meta—in exchange for the use of Google Analytics and the Meta Pixel (and the market research and consumer analysis obtained from those tools)—without obtaining Plaintiffs' and Class members' prior written authorization. Although Google Analytics and the Meta Pixel can be used for free, the implicit cost of these technologies was Plaintiffs' and Class members' identifying information and protected health data for use in targeted advertising. Plaintiffs and Class members PII and PHI has enormous market value, including to Google, Meta, and Blue Shield. Both Google and Meta used the information gathered from Plaintiffs and Class members to improve their analytics insights and advertising services for Blue Shield and other website owner customers. Blue Shield also used enrollees' PII and PHI for targeted advertising campaigns via Google Ads and on Facebook and Instagram.

288. Blue Shield, Meta, and Google intentionally received, read, and used information produced by those interceptions, which included the intercepted contents of Plaintiffs and Class members' confidential and protected communications. Google Analytics and the Meta Pixel returned the intercepted contents to Blue Shield and Blue Shield used the contents of the interceptions through analytics dashboards, event-level data, reports, audience tools, conversion-flow analyses, and advertising interfaces. It analyzed individual and aggregate activity; tracked enrollee journeys and conversion flows; segmented enrollees and other website visitors; created custom and retargeting audiences, including authenticated Blue Shield members; designed and deployed ads through Google Ads, Facebook, and Instagram that were informed by that data; and measured and optimized those campaigns for greater engagement, lower cost per lead (CPL) and cost per acquisition (CPA), increased enrollment, and other commercial benefits.

289. Blue Shield's use was distinct from Google's or Meta's display of an advertisement. Google and Meta supplied technology and advertising platforms, but Blue Shield designed and deployed its own campaigns. Blue Shield chose the advertisements, audience segments, and platform and landing pages; activated the campaigns; and used the intercepted contents and resulting analytics to decide whom to target and how to optimize its marketing. Blue Shield also used the contents to evaluate website activity and enrollee behavior—including as it related to medical searches and "Find a Doctor" results—whether or not an advertisement was ultimately displayed.

290. Blue Shield acted intentionally. It affirmatively installed and configured the trackers, enabled Google Signals and the Google Analytics–Google Ads connection, configured Meta Pixel functions and custom events, logged in to review the data, created reports and audience segments, and deployed and optimized campaigns using the intercepted communications. Blue Shield's internal paid-media materials, targeting and retargeting activities, and subsequent decision to sever the Google Analytics–Google Ads connection confirm its deliberate use.

291. When Blue Shield used the contents of Plaintiffs and Class members' confidential communications, it knew or had reason to know that the information had been obtained through unlawful interception. Blue Shield was the architect and active manager of the real-time tracking. It

knew the data came from automatic, contemporaneous acquisition of enrollees' protected communications on its website; could see and analyze the intercepted information through Google's and Meta's tools; was warned not to place Google Analytics tags on authenticated or healthcare-related pages or permit Google to collect PHI and agreed to Google's terms restricting the collection of PII and PHI; was warned not to send health or HIPAA-protected information to Meta or use it to create custom audiences or in advertising; knew its own HIPAA obligations—as reflected in its HIPAA notices, privacy notices, internal documents, and its terms with various vendors—and that the intercepted data was protected; and knew that it had never informed enrollees of its conduct, nor sought or received valid enrollee authorization. Blue Shield nevertheless continued using the tracking and advertising functions. Blue Shield therefore knew both how the information had been acquired and the facts that made the acquisition unlawful.

292. Plaintiffs and Class members did not authorize or consent to Blue Shield's , Google's, or Meta's use of the contents of their intercepted communications for analytics, audience creation, advertising, marketing, or other commercial purposes. Blue Shield's Privacy Policy and HIPAA Notice did not clearly disclose the challenged practices and, instead, represented that PHI would not be used for marketing without prior written authorization. No statutory exception authorized Blue Shield's intentional disclosures and the subsequent uses of Plaintiffs' and Class members' protected data.

293. Blue Shield's violations of Section 2511(1)(d) caused Plaintiffs and Class members injury and damages, including invasion of privacy, loss of control over confidential health communications, use of their PII and PHI for unauthorized profiling and advertising, and the other harms alleged above.

294. Under 18 U.S.C. § 2520(b)(1)-(3), Plaintiffs and Class members seek all available equitable and declaratory relief, actual or statutory damages, punitive damages, reasonable attorneys' fees, and litigation costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court enter an order:

A. Certifying the Class;

B. Finding that Blue Shield's conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Blue Shield;

D. Awarding injunctive and any other equitable relief the Court deems appropriate;

E. Awarding Plaintiffs and Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and disgorgement of profits unlawfully obtained;

F. Awarding Plaintiffs and Class members pre- and post-judgment interest;

G. Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury of all issues so triable of right.

DATED: July 31, 2026

Respectfully submitted,

By: *<u>/s/ Adam Polk</u>*

Adam Polk (SBN 273000)
Abbye R. K. Ognibene (SBN 311112)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: apolk@girardsharp.com
Email: abbyeo@girardsharp.com

By: <u>*/s/ Amber L. Schubert*</u>
Robert C. Schubert (No. 62684)
Amber L. Schubert (No. 278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
Email: rschubert@sjk.law
Email: aschubert@sjk.law

*Interim Co-Lead Class Counsel*